## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Howard Goldman,** | **Case No. 1:25-cv-0086-PAB** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **American Airlines, Inc., et al.,** | **MEMORANDUM OPINION & ORDER** |
| **Defendants.** | |

Currently pending before the Court is the Partial Motion to Dismiss Pursuant to Rule 12(b)(6) and Motion to Strike Punitive Damages Pursuant to Rule 12(f)(2) of Defendants Republic Airways, Inc. ("Republic Airways"), Melissa Symes-Patalano, and Captain Nicholas Pino (together, the "Republic Defendants"), filed on May 27, 2025 ("Republic Defendants' Motion").  (Doc. No. 23.) On July 10, 2025, Plaintiff Howard Goldman ("Dr. Goldman" or "Plaintiff") filed an Opposition to the Republic Defendants' Motion. (Doc. No. 34.)  On  August 4, 2025, the Republic Defendants filed a Reply in support of their Motion ("Republic Defendants' Reply).  (Doc. No. 45.)

Also pending before the Court is the Motion for Partial Dismissal on Behalf of Defendant American Airlines, Inc. ("AAI"), filed on May 30, 2025 ("AAI's Motion").  (Doc. No. 26.)  On July 14, 2025, Dr. Goldman filed an Opposition to AAI's Motion.  (Doc. No. 35.)  On August 4, 2025, AAI filed a Reply in support of its Motion ("AAI's Reply").  (Doc. No. 42.)

Also pending before the Court is the Motion for Partial Dismissal on Behalf of Christy Ford and Theresa Powell ("AAI Employees"), filed on May 30, 2025 ("AAI Employees' Motion").  (Doc. No. 27.)  On July 14, 2025, Dr. Goldman filed an Opposition to the AAI Employees' Motion.  (Doc.

No. 36.)  On August 4, 2025, the AAI Employees filed a Reply in support of their Motion  ("AAI's Reply").  (Doc. No. 43.)

Finally, pending before the Court is the Motion to Dismiss on Behalf of American Airlines Group, Inc. ("AAG"), filed on June 6, 2025 ("AAG's Motion").  (Doc. No. 29.)  On July 21, 2025, Dr. Goldman filed an Opposition to AAG's Motion.  (Doc. No. 41.)  On August 4, 2025, AAG filed a Reply in support of its Motion ("AAG's Reply").  (Doc. No. 44.)

For the following reasons, the Republic Defendants' Motion is GRANTED; AAI's Motion is GRANTED; the AAI Employees' Motion is GRANTED; and AAG's Motion is GRANTED.

# I.    Background

## A.    Factual Allegations

### 1.    General Allegations

Dr. Goldman alleges that he is "a member of a protected class" because he is an observant "Orthodox Jewish man[,]" "of Jewish descent[,]" and his "religion is Judaism[.]"  (Doc. No. 1 at PageID# 4, ¶¶ 3-5.)  "In accordance with his religious beliefs, Dr. Goldman wears a yarmulke on his head."  (*Id.* at PageID# 7, ¶ 23.)  "[A]t all times relevant, Dr. Goldman wore a yarmulke as is customary in the Jewish religion."  (Doc. No. 1 at PageID# 11, ¶ 38.)  He "is a member of a racial minority and protected class – the Jewish racial minority group[.]"  (*Id.* at PageID# 19, ¶ 84.)

According to Dr. Goldman, on or about January 4, 2024, he "entered into a binding contract with Defendants American, American Airlines Group, Republic and/or Republic Airways Holdings when he purchased a ticket for American Airlines Flight 4302 from Cleveland Hopkins International Airport to John F. Kennedy International Airport (hereinafter "JFK") that was scheduled to depart Cleveland Hopkins International Airport on January 18, 2024."  (*Id.* at PageID# 11, ¶ 35.)  "Republic and/or Republic Airways Holdings was a contracted carrier by American and/or American Airlines

Group for Flight 4302." (*Id.*, ¶ 36.)  Defendants Ford and Powell "were acting within the course and scope of their employment with Defendants American, American Airlines Group, Republic, and/or Republic Airways Holdings." (*Id.* at PageID# 12, ¶ 41.)

### 2.   Dr. Goldman arrives at the gate for Flight 4302.

On January 18, 2024, Dr. Goldman arrived at the gate for Flight 4302, had with him a carry-on bag and his briefcase, and he "was one of the last people to board the plane[.]"  (Doc. No. 1 at PageID# 11, ¶¶ 39-41.)  At the gate, Powell (the "gate agent")  told Dr. Goldman "that he would have to check his carry-on bag."  (*Id.*, ¶ 41.)  However, because he "had medication, religious items (including his Hebrew prayer book, prayer shawl, phylacteries), and valuables in his carry-on, Dr. Goldman kindly requested if there was any way to see if there was any space for his carry-on." (*Id.*) According to Dr. Goldman, during his discussion with Powell, "Ford cut in and Defendant Ford and/or Defendant Powell told Dr. Goldman that he could either remove valuable items from the bag or he would have to rebook his flight for the following day." (*Id.*)

He complied with Ford and Powell's instruction.  (*Id.*, ¶ 42.)  "Before doing so," he alleges that he "removed his medication, religious articles, and valuables from his carry-on and placed them in his briefcase which Dr. Goldman intended to serve as his 'personal item' (as is customary and permitted on most if not all commercial flights, including United Flight 4302) for the duration of the flight to JFK.   After he removed his briefcase,[1] Dr. Goldman turned his carry-on bag over to Defendant Ford to be gate checked without incident, and proceeded down the jet way to board the plane."  (*Id.*)  He removed those items from his carry-on bag for placement in his briefcase "with

---

[1] The Court construes Dr. Goldman's allegation that he "removed his briefcase" to mean that after he removed his medication, religious articles and valuables from his "carry-on" and put them in his briefcase, he turned his carry-on bag over to Defendant Ford.

Defendant Ford and/or Defendant Powell's approval." (*Id.*)  Dr. Goldman intended his briefcase to serve as his personal item.  (*Id.*)

Thus, after removing those items from his carry-on bag and placing them in his briefcase (his "personal item"), his "briefcase included Dr. Goldman's valuables, including his medication, laptop, and Jewish religious articles." (*Id.*, ¶ 43.)  Dr. Goldman then "boarded the flight with his briefcase." (*Id.*, ¶ 44.)

### 3.    Dr. Goldman boards Flight 4302.

Once he boarded Flight 4302 with his briefcase containing his religious items and valuables, he "observed vacant space in the overhead bin compartments in the First-Class section[.]" (*Id.*)  He then "turned back to Defendant Ford and/or Defendant Powell who was standing at the entrance of the aircraft and respectfully requested that he be able to place his carry-on in the overhead bin compartments in first class[.]" (*Id.*)  "Defendant Ford and/or Defendant Powell responded that a certain number of bags had already been placed in the overhead bin compartments and they would be unable to place another carry-on in the overhead bin compartments." (*Id.*)  According to Dr. Goldman, no one told him that he could not place his briefcase in the overhead bin compartments in the First Class section of the aircraft and there were not any signs or other indicators that he could not do so.  (*Id.*, ¶ 45.)

After explaining that "they would be unable to place another *carry-on* in the overhead bin compartments," "Dr. Goldman placed his *briefcase*, which included his medication, laptop, and Jewish religious articles, in the overhead bin compartments in the First-Class section of the aircraft and then continued down the aisle to his assigned seat." (*Id.*, ¶ 46) (emphasis added).  According to Dr. Goldman, he did this because as "an orthodox Jewish man, [he] was uncomfortable with his briefcase, which contained Jewish religious articles, his medication, and his laptop, being placed

4

beneath the seat in front of him on the floor, because placing Jewish religious articles on the floor would be disrespectful to his orthodox Jewish religion." (*Id.*, ¶ 47.)

Dr. Goldman alleges that "upon information and belief," "Defendant Symes-Patalano, Defendants Jane Does 1 - 3, Defendant John Does 1 - 3, Defendant Ford, and/or Defendant Powell[2] falsely alleged that Dr. Goldman was walking up and down the jetway four to five times, blocking other passengers from getting on the plane, refusing to go to his seat, telling people around him that this was Anti-Semitic and a terrorist type of activity that the gate agents and flight attendants were doing to him" and that they "falsely advised pilot Defendant Pino and John Doe, First Officer, AA Flight 4302" of that allegation "and/or made other false allegations against Dr. Goldman." (*Id.* at PageID#s 13-14, ¶¶ 48-49.)

### 4. The Flight Staff demand that Dr. Goldman exit the aircraft.

After being advised of those allegations, Captain Pino and the John Doe First Officer "ordered and/or authorized" the Flight Staff "to demand Dr. Goldman to exit the aircraft." (*Id.*, ¶ 50.)

"While seated," one or more members of the Flight Staff "appeared at Dr. Goldman's seat and demanded that he exit the aircraft." (*Id.*, ¶ 51.) Ford "called a gate agent and told him that she was removing Dr. Goldman from the plane and asked the gate agent to come down the jetbridge" and "[u]pon meeting with the gate agent, [she] informed [the gate agent] that Dr. Goldman was going to be brought off of the aircraft." (*Id.*, ¶ 52.) Dr. Goldman asked a member of the Flight Staff "why she/they was/were demanding that he leave the aircraft." (*Id.*, ¶ 53.) They "responded by stating Dr. Goldman had to get off the aircraft now. Dr. Goldman again asked why he had to get off the plane, to which [the Flight Staff] threatened to call the police. Up until this point, Dr. Goldman had never left his seat." (*Id.*, ¶ 53.) Dr. Goldman concedes that "[t]o this point, [he] still had no knowledge as

---

[2] "Defendants Symes-Patalano, Defendants Jane Does 1 - 3, Defendant John Does 1 - 3, Defendant Ford, and/or Defendant Powell" are hereinafter collectively referred to as the "Flight Staff."

to why [the Flight Staff] was/were demanding that he exit the aircraft." (*Id.*, ¶ 54.) "After threatening to call the police, [the Flight Staff] exited the aircraft[,]" yet "Dr. Goldman remained in his seat." (*Id.*, ¶ 55.)

Approximately five (5) minutes later, "an officer with the Cleveland Division of Police entered the aircraft and approached Dr. Goldman's seat" and "told Dr. Goldman that he had to exit the aircraft.  To which Dr. Goldman asked why he has to exit the aircraft.  The Officer told Dr. Goldman that is what Defendant Powell told the officer." (*Id.*, ¶¶ 56-57.) "Dr. Goldman continued to ask in a calm manner why he was being forced to leave the aircraft to which the Officer did not have a direct answer." (*Id.*, ¶ 58.) "After their conversation, the Officer exited the aircraft" while "Dr. Goldman remained on the aircraft in his seat." (*Id.*, ¶ 59.)

### 5.  Dr. Goldman and Rabbi Marozov approach Captain Pino.

Another passenger, Rabbi Yossi Marozov,[3] also "a visibly orthodox Jew," "suggested that Dr. Goldman speak with the pilot to understand why he is being removed from the aircraft." (*Id.*, ¶¶ 60, 70.)  At that point, both Rabbi Marozov and Dr. Goldman proceeded "to the front of the aircraft to ask Defendant Nicholas Pino, the pilot, why Dr. Goldman was being removed from the flight." (*Id.*, ¶ 61.)  Captain Pino responded that the Flight Staff had told him "that a passenger (Dr. Goldman) had to be removed." (*Id.*, ¶ 62.)  Dr. Goldman and Rabbi Marozov then "asked why [the Flight Staff] wanted a passenger (Dr. Goldman) removed.  Dr. Goldman asked the pilot if there was anything he did wrong and if so, Dr. Goldman attempted to apologize." (*Id.*, ¶ 63.) "At this point, [the Flight Staff] began to deplane the aircraft" and Captain Pino "stated that now that the passengers were being deplaned, there is no way the flight can take off with Dr. Goldman on the aircraft." (*Id.*, ¶¶ 64-65.) "In response, Dr. Goldman exited the aircraft." (*Id.*, ¶ 66.)

---

[3] Dr. Goldman asserts in his Opposition briefs that Marozov is a Rabbi.  (*See, e.g.*, Doc. No. 34 at PageID# 364.)

### 6.      Dr. Goldman is arrested at the gate area and incarcerated.

After he exited the aircraft, "Dr. Goldman went back to the gate area where Dr. Goldman remained for approximately ten (10) minutes.  As Dr. Goldman was waiting in the gate area, AA Flight 4302 began to reboard."  (*Id.*, ¶ 67.)  "After the approximate ten (10) minutes Dr. Goldman spent in the gate area, a Supervisor of the Cleveland Division of Police spoke with Defendant Powell." (*Id.*, ¶ 68.)  "After his conversation with [the Flight Staff], the Cleveland Division of Police Officer approached Dr. Goldman and placed him under arrest."  (*Id.*, ¶ 69.)  "[T]he officers did not allow Yossi Marozov [] to reboard the aircraft."  (*Id.*, 70.)  Flight 4302 "departed without Dr. Goldman." (*Id.*, ¶ 72.)  Dr. Goldman alleges that "after being subjected to such profound racial and/or religious discrimination, Dr. Goldman was not able to board an alternative flight to New York[.]"  (*Id.*, ¶ 73.)

After his arrest, "Dr. Goldman was transported to Cuyahoga County Jail where he was incarcerated overnight[,]" "placed in a one-bed cell with another inmate[,]" and "forced to sleep on the floor."  (*Id.*, ¶¶ 71, 75.)  "Dr. Goldman was held in a holding cell with violent criminals who asked him what the 'Jew boy' was doing there."  (*Id.*)  He claims he "was unable to eat during his time of incarceration because the jail did not offer Kosher accommodations for his Orthodox Jewish religion."  (*Id.*, ¶ 75.)  "[H]e requested he be provided with his religious items so that he could do his morning prayers, to which he was refused."  (*Id.*, ¶ 76.)  "As a result of what transpired, Dr. Goldman was shocked, confused, deeply humiliated, disrespected, lost, and perplexed during the entire course of events as he was subjected [] to racial and religious discrimination in front of a planeload of other passengers."  (*Id.*, ¶ 77.)

### 7.      Attribution of Discrimination to Defendants

According to Dr. Goldman, the Flight Staff's "motivation to remove Dr. Goldman from the aircraft did not involve a safety concern, but rather was an arbitrary and capricious decision motivated

by racial and religious animus towards the Jewish religion and Jewish individuals, such as Dr. Goldman, of the Jewish faith, and Dr. Goldman's efforts to adhere to the laws and customs of his Jewish religion." (*Id.*, ¶ 78.) Captain Pino's, the First Officer's, and the Flight Staff's "motivation to order Plaintiff to exit the aircraft did not involve safety concerns, but rather, was motivated by racial and religious animus towards the Jewish religion and individuals, such as Dr. Goldman, of the Jewish faith, and Dr. Goldman's efforts to adhere to the laws and customs of his Jewish religion." (*Id.*, ¶ 79.) He was "ejected from the flight based on" Captain Pino's, the First Officer's, and the Flight Staff's "racial and/or religious prejudice against Dr. Goldman for being Jewish and exercising his religious beliefs, their complete lack of sensitivity to Dr. Goldman's religious needs, and based upon the false assertion that there was no more space in overhead compartments, and not for any legitimate reason(s) related to safety and/or security." (*Id.*, ¶ 80.)

"[A]t all times relevant," the actions of all Defendants were "malicious, oppressive and/or in reckless disregard of the Plaintiff's rights[.]" (*Id.*, ¶ 81.) According to Dr. Goldman, "Defendants American, American Airlines Group, Republic, Republic Airways Holdings is and/or are vicariously liable under the legal principle of *respondeat superior* for the tortious conduct of its employees and/or agents," Captain Pino, the First Officer, and the Flight Staff. (*Id.*, ¶ 82.)

Dr. Goldman asserts that, "despite his race, nationality, culture, religion, skin, and color, [he] had the same civil rights to be treated equally in making and enforcing contracts as white citizens pursuant to 42 U.S.C. § 1981." (*Id.*, ¶ 84.) "Therefore, when Plaintiff contracted with American and/or American Airlines Group, a commercial air carrier engaged in air transportation services for passage on AA Flight 4302 from Cleveland Hopkins International Airport to JFK, Plaintiff had equal rights of performance, benefits, privileges, terms, and conditions of the contracts entered into by and enjoyed by white citizens. Plaintiff had the right to be treated equally and, in a manner, free from

discrimination pursuant to the Act." (*Id.*, ¶ 85.) Defendants "violated Plaintiff's civil rights by denying him equal treatment in making and enforcing his contract with American and/or American Airlines Group." (*Id.*, ¶ 86.) Defendants "intentionally, purposefully, and maliciously discriminated against Plaintiff based on his Jewish race and religion when [they] removed Plaintiff, directly or indirectly, from the contracted flight on January 18, 2024, for no wrong but for being Jewish, adhering to his Jewish faith, and for reasonably requesting that he not be forced to place his Jewish religious articles on the floor or underneath the airplane, which would violate his Jewish religion." (*Id.*, ¶ 87.) Dr. Goldman claims that Defendants "are liable for the religious and racially charged discriminatory conduct and actions of [their] agents and employees" and "had no legitimate reason or justification to remove Dr. Goldman from the flight. (*Id.*, ¶ 88.) Defendants "made false allegations relating to Dr. Goldman and/or lied by stating that Dr. Goldman and/or the placement of his briefcase presented a safety issue. In fact, the truth was that Dr. Goldman's removal from the aircraft was for racial and religious discriminatory reasons." (*Id.*) Those actions, he contends, were "all times relevant, malicious, oppressive and/or in reckless disregard of the Plaintiff's rights." (*Id.*, ¶¶ 89, 94.)

He claims he "had the right to participate and enjoy the benefits of federally assisted programs and not be excluded or discriminated against based on race, color, or national origin pursuant to 42 U.S.C. § 2000d." (*Id.*, ¶ 92.) Regarding the receipt of federal funding, he alleges that

> [a]t all times relevant hereto, American, American Airlines Group, Republic, and/or Republic Airways Holdings were and/or are commercial air carriers receiving federal assistance as they operate according to the rules and regulations of the Federal Aviation Agency and the Department of Transpiration, Department of Homeland Security, and work in compliance with various other federal agencies. American Airlines and Republic Airways also receive federal funds via federal subsidies and therefore are subject to 42 U.S.C. § 2000d. Defendants through and by the actions of their agents and employees violated 42 U.S.C. § 2000d when they deprived, directly or indirectly, individually or collectively, the Plaintiff of the participation and benefits of federally regulated commercial air travel.

(*Id.*, ¶ 93.)

9

## II.     Procedural History

On January 17, 2025, Dr. Goldman filed his Complaint.  (Doc. No. 1.)  Therein, he asserts six (6) claims against all Defendants: (1) Count 1: Civil Rights Violations Under the Civil Rights Act of 1866, 42 U.S.C. § 1981(a); (2) Count 2: Violation of 42 U.S.C. § 2000d; (3) Count 3: Breach of Contract; (4) Count 4: Negligence; (5) Count 5: Intentional Infliction of Emotional Distress; (6) Count 6: False Imprisonment.  (*Id.* at PageID#s 18-30.)  Dr. Goldman also seeks punitive damages and attorneys' fees.  (*Id.* at PageID# 30.)

On May 27, 2025, the Republic Defendants filed their Motion, seeking to dismiss Counts 1, 2, 3, and 5, and to strike Dr. Goldman's request for punitive damages, but they did not seek to dismiss Counts 4 and 6.  (Doc. No. 23.)  On July 10, 2025, Dr. Goldman filed his Opposition thereto, and on August 4, 2025, the Republic Defendants filed their Reply.  (Doc. No. 34; Doc. No. 45.)

On May 30, 2025, AAI filed its Motion, seeking to dismiss Counts 1, 2, 3, 5, and 6 and to strike Dr. Goldman's request for punitive damanges, but it did not seek to dismiss Count 4.  (Doc. No. 26.)  On July 14, 2025, Dr. Goldman filed his Opposition thereto, and on August 4, 2025, AAI filed its Reply.  (Doc. No. 35; Doc. No. 42.)

Also on May 30, 2025, the AAI Employees filed their Motion, seeking to dismiss Counts 1, 2, 3, 5, and 6 and to strike Dr. Goldman's request for punitive damages, but they did not seek to dismiss Count 4.  (Doc. No. 26.)  On July 14, 2025, Dr. Goldman filed his Opposition thereto, and on August 4, 2025, the AAI Employees filed their Reply.  (Doc. No. 36; Doc. No. 43.)

Lastly, on June 6, 2025, AAG filed its Motion seeking to dismiss all Counts and to strike Dr. Goldman's request for punitive damages, and in support thereof, incorporated the arguments made in AAI's Motion.  (Doc. No. 29.)  On July 21 2025, Dr. Goldman filed his Opposition thereto, and on August 4, 2025, AAG filed its Reply.  (Doc. No. 41; Doc. No. 44.)

### III. Standard of Review

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n*., 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly,* 550 U.S. at 555–56). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not

11

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## IV.    Analysis

### A.    Civil Rights Act Violation under Civil Rights Act of 1866, 42 U.S.C. § 1981(a)

All Defendants argue that the Court should dismiss Dr. Goldman's § 1981 claim (Count 1) because he has only pled discrimination on the basis of religion, and not on the basis of race. The Republic Defendants additionally argue that the Court should dismiss this claim because the Complaint shows that their conduct did not abridge his right to make and enforce contracts.  AAI and the AAI Employees (and by incorporation, AAG) argue that 49 U.S.C. § 44902(b)'s permissive refusal provision creates an affirmative defense that entitles them to dismissal of Dr. Goldman's § 1981 claim.  The Court addresses each argument below.

### 1.    Dr. Goldman's well-pled allegations fail to plausibly show that Defendants intentionally discriminated against him based on his Jewish racial identity.

For the following reasons, the Court concludes that Dr. Goldman has insufficiently alleged discrimination "on the basis of race[,]" so his § 1981 claim must be dismissed.

The Civil Rights Act of 1866 provides that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  Therefore, "[i]n order to establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in

section 1981(a)." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 871-72 (6th Cir. 2001)). "Section 1981 guarantees the right 'to make and enforce contracts.'" *Greer v. Cummins, Inc.*, 2023 WL 9472037 at *3 (6th Cir. Oct. 23, 2023). The plaintiff must prove that his race was the but-for cause of his contractual impairment, not merely a motivating factor. *Bloomer v. Word Network Operating Co., Inc.*, 785 F. Supp. 3d 251, 267 (E.D. Mich. 2025) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020)).

Defendants contend that the distinction between Dr. Goldman's alleged religious and racial discrimination is important. It is well-established that 42 U.S.C. § 1981 does not create a cause of action based on religious discrimination. *See Runyon v. McCrary*, 427 U.S. 160, 167 (1976) (explaining that the consolidated cases did "not present any question of the right of a private school to limit its student body to boys, to girls, or to adherents of a particular religious faith, since 42 U.S.C. § 1981 is in no way addressed to such categories of selectivity."); *Abdulasam v. Franklin Cty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009) (citing *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) and *Runyon*, 427 U.S. at 167; *Doe v. Matthew 25, Inc.*, 322 F. Supp. 3d 843, 855 (M.D. Tenn. 2018) (citing *Runyon*, 427 U.S. at 167). [4]

In their Motion, the Republic Defendants argue that despite the multiple references to Dr. Goldman's Jewish racial background, "his allegations are couched entirely in terms of [his] religion." (Doc. No. 23 at PageID# 223.) They point to his "wearing a yarmulke, his status as an Orthodox Jewish man, [and] his Jewish religious articles" and contend that "his disputes with the flight crew

---

[4] *See also McCoy v. Homestead Studio Suites Hotels*, 177 Fed. Appx. 442, 445 (5th Cir. 2006) (citing *Runyon*, 427 U.S. at 167) ("plaintiffs fail to state a claim under § 1981 because the statute does not protect against religious discrimination."); *Shapolia v. Los Alamos Nat. Lab'y*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citation omitted) ("[s]ection 1981 does not apply to sex or religious discrimination.").

arose from alleged religious discrimination." (*Id.*)  Specifically, they assert that "the focus of his concern was the placement of his *religious* items" and that he has, in effect, only "us[ed] the word race in [his] complaint," but "the alleged discrimination is based on something else[.]"  (*Id.* at PageID#s 223-25.)  Relying on *Ashcroft v. Iqbal*, the Republic Defendants conclude "[u]nder the applicable 12(b)(6) pleading standard, in the absence of any genuine factual allegations related to race, there cannot be a reasonable inference of racial discrimination, and any such claim is implausible."  (*Id.* at PageID#s 224, 225-26) (citing 556 U.S. at 678).

Like the Republic Defendants, AAI and the AAI Employees[5] also highlight the distinction between religious and racial discrimination. They assert that Dr. Goldman has failed to allege a plausible claim for racial discrimination because he has only "offerre[d] conclusory references to his 'race,' status as a 'racial minority,' 'racial discrimination,' and other 'racial connotations.'"  (Doc. No. 26 at PageID#s 254-55.)  According to AAI and the AAI Employees, it was Defendants' "religious animus towards the Jewish religion" and Dr. Goldman's "efforts to adhere to the laws and customs of the Jewish religion, and their "complete lack of sensitivity" to his beliefs" that caused Dr. Goldman to be ejected from the airplane, not discrimination on the basis of his Jewish racial identity. (*Id.* at PageID#s 254-55.)  All Defendants cite *El-Zabet v. Nissan N. Am., Inc.*, 211 Fed. Appx. 460 (6th Cir. 2006), where the Court held that an arab man's single reference to "racial discrimination" in a complaint otherwise sounding in national-origin discrimination (which, like religion, is also not actionable under § 1981) was insufficient to state his § 1981 claim.  (Doc. No. 23 at PageID#s 224-25; Doc. No. 26 at PageID# 254.)

In each of his Oppositions to the Republic Defendants, AAI and AAI Employees' Motions, Dr. Goldman relies on *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) where the Supreme

---

[5] The AAI Employees' Motion is in very large part a verbatim replication of AAI's Motion, so the Court will only cite to AAI's Motion except where the AAI Employees advance a distinct argument.

Court held that Jews are a racial identity for purposes of § 1981 and § 1983 claims.  (Doc. No. 34 at PageID# 367; Doc No. 35 at PageID#s 387-89; Doc. No. 36 at PageID#s 408-09.)  He concedes that he does mention religious discrimination, but he *also* pleads racial discrimination, which, in his view, distinguishes him from the plaintiff in *El-Zabet*, who had pled only national-origin discrimination but only mentioned "racial harassment" in passing.  (Doc. No. 34 at PageID# 368; Doc. No. 35 at PageID# 388; Doc. No. 36 at PageID#s 409-11.)   In essence, Dr. Goldman responds that his "allegations [] explicitly invoke race and provide factual context supporting discriminatory intent."  (Doc. No. 34 at PageID# 368.)  He claims he meets *Iqbal*'s plausibility pleading standard because

> [t]he Complaint provides specific factual allegations—Dr. Goldman's visible Jewish identity, false accusations, denial of overhead bin space, and removal from the flight— that support a plausible inference of racial discrimination.  At this stage, Dr. Goldman need only  plead facts allowing the Court to draw a reasonable inference of liability, which he has done.

(Doc. No. 36 at PageID# 410) (internal citations omitted).

In the Republic Defendants' Reply, they acknowledge *Shaare Tefila Congregation*'s holding that "people born into Jewish and Arab ethnicities can maintain racial discrimination claims under § 1981." (Doc. No. 45 at PageID# 503) (citing 481 U.S. at 617-18 and *St. Francis College. v. Al-Khazraji*, 481 U.S. 604, 607 (1987)).  But the alleged discrimination, they reiterate, is "based entirely on his religious identifiers that symbolize a perons's faith, rather than a person's race."  (*Id.* at PageID# 504.)  "[W]hile Dr. Goldman's "race and religion may be intertwined," they argue, "he must still plead facts giving rise to a plausible inference of race-based discrimination."  (*Id.* at PageID# 505.)  And they cite *Lubavitch-Chabad of Ill., Inc., v. Northwestern Univ.*, 772 F.3d 443, 446 (7th Cir. 2014) (Posner, J.), to support their argument that the law requires the Court to distinguish between the ethnic group of Jews, and the practice of Judaism.  (*Id.* at PageID# 504.)  In their Replies, AAI and the AAI Employees largely echo the Republic Defendants' arguments. (Doc. No. 42 at PageID# 475.)

15

As a threshold matter, Defendants try to draw a distinction between Dr. Goldman's allegations of religious discrimination and his allegations of racial discrimination.  Ultimately, they contend, his Complaint only concerns religious discrimination because the underlying dispute arose from Dr. Goldman's inability to place Jewish religious items in his chosen area of the plane, not from anything related to his Jewish racial identity.  But the Court need not resolve this legal dispute to adjudicate Dr. Goldman's § 1981 claim.  Even granting Dr. Goldman the benefit of the doubt by assuming that the religious-based discrimination he alleges counts as race-based discrimination, for the reasons set forth below, his well-pled allegations are still insufficient to plausibly infer intentional race-based discrimination, so his § 1981 claim fails.

The analysis in this Section proceeds as follows.  (1) First, in Section IV.A.1.a., the Court applies *Iqbal*'s plausibility pleading standard to identify which of Dr. Goldman's allegations relevant to his § 1981 claim are well-pled and therefore entitled to the "assumption of truth."  The Court holds that Dr. Goldman's allegations in Paragraphs 3-5 and 20-76 are well-pled.  (2) Second, in Section IV.A.1.b., the Court identifies which allegations are conclusory, and therefore are not so entitled.  The Court concludes that Paragraphs 1-2, 6, and 77-90 are not well-pled.[6]  (3) Third, in Section IV.A.1.c., the Court explains why those well-pled remaining allegations, taken as true, fail to state a plausible claim for intentional discrimination based on Dr. Goldman's Jewish racial identity.

### a)       Dr. Goldman's Well-Pled Allegations

Dr. Goldman's Complaint and the complaint in *Iqbal* share the same fatal flaw; stripped of their legal conclusions, their factual allegations do not plausibly allege discrimination.[7]  In *Iqbal*, the

---

[6] Paragraph 7 is addressed in Section IV.B.4., and Paragraphs 8-19 refer only to jurisdiction. (*Id.* at PageID#s 4-7.)

[7] *See Elmaghraby, et al., v. Ashcroft, et al.*, No. 04-CV-1809, Doc. No. 35, 2004 WL 3756442 (E.D.N.Y Sept. 30, 2004) (First Amended Complaint) (hereinafter, "*Iqbal* Complaint").

16

Supreme Court held that the plaintiff, Iqbal, had not "nudged his claims of invidious discrimination across the line from conceivable to plausible." 566 U.S. at 681 (quoting *Twombly*, 550 U.S. at 547) (cleaned up).

To determine whether Iqbal's complaint failed Rule 8's pleading standard, the Court applied a "two-pronged approach." *Iqbal*, 556 U.S. at 679. (1) First, the Court "beg[an] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," *id.*, and (2) second, the Court evaluated whether the remaining "well-pleaded factual allegations," assumed to be true, "plausibly give rise to an entitlement to relief." *Id.* at 680.[8] Pursuant to that two-pronged approach, the Court held that Iqbal's allegation in Paragraph 96 of his complaint, i.e., that the defendants "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of his religion, race, and/or national origin and for no legitimate penological interest[,]'"[9] was a "bare assertion" "not entitled to the assumption of truth" because it was merely "a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* (quoting *Twombly*, 550 U.S. at 555).

For the following reasons, the Court holds that Dr. Goldman's allegations in Paragraphs 3-5 and 20-76 are well-pled.

Paragraphs 3-5 detail his status as an "observant Orthodox Jewish man" who is "of Jewish descent" and provide that "his religion is Judaism." (Doc. No. 1 at PageID# 4, ¶¶ 4-5.) Paragraphs 20-23 further indicate that Dr. Goldman is "an adult male and medical doctor" who is "of Jewish descent[,]" and again provide that he "is an observant Orthodox Jewish man" who "wears a

---

[8] *Accord HCRI TRS Acquirer, LLC v. Iwer*, 708 F. Supp. 2d 687, 690 (N.D. Ohio 2010); *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 959 (E.D. Ky. 2019); *Scott v. Regions Bank*, 702 F. Supp. 2d 921, 927 (E.D. Tenn. 2010).

[9] *Id.* (quoting *Iqbal* Compl., 2004 WL 3756442, ¶ 96).

17

yarmulke[.]" (*Id.* at PageID# 7, ¶¶ 20-23.) Paragraphs 24-34 describe the corporate status of American Airlines, AAG, Republic Airways, Republic Airways Holdings, and the occupations of Ford, Symes-Patalano, Captain Pino, Powell, and the John/Jane Does Flight Staff. (*Id.* at PageID#s 7-11, ¶¶ 24-34.) Paragraphs 35-76 contain factual allegations which do not assume legal conclusions because they chronologically recount what Dr. Goldman and Defendants said and did in a plain, objective manner without speculating about their internal motivations. (*Id.* at PageID#s 11-17, ¶¶ 35-76.)

Based on these well-pled allegations, the Court finds that there are seven (7) incidents that Dr. Goldman points to as support for his discrimation claim: (1) Powell and Ford's initial instruction that Dr. Goldman check his carry-on bag at the gate (*Id.* at PageID#s 11-12, ¶¶ 35-43 ); (2) After boarding Flight 4302, the Flight Staff's denial of his request that they reverse Powell and Ford's initial decision by allowing him to place his carry-on bag in the overhead bin compartment in First Class (*Id.* at PageID#s 12-13 ¶¶ 44-46); (3) Captain Pino's decision to eject Dr. Goldman based on the Flight Staff's "false allegations" (*Id.* at PageID#s 13-15, ¶¶ 47-50); (4) The Flight Staff's and CPD's unsuccessful attempt to execute Captain Pino's orders to remove Dr. Goldman from Flight 4302 (*Id.* at PageID# 14-15 ¶¶ 51-59 ); (5) Dr. Goldman and Rabbi Marozov's interaction with Captain Pino and the order to deplane (*Id.* at PageID#s 15-16 ¶¶ 60-66); (6) Dr. Goldman's arrest at the gate and Rabbi Marozov's inability to reenter the airplane (*Id.* at PageID# 16 ¶¶ 67-70); and (7) Dr. Goldman's incarceration. (*Id.* at PageID# 17 ¶¶ 71-76.)

### b) Dr. Goldman's Conclusory Allegations

But aside from those allegations, the allegations on which Dr. Goldman relies to support his claim for intentional racial discrimination are nearly identical to Iqbal's conclusory allegations.

Paragraph 1 describes the nature of the action as one to vindicate Dr. Goldman's "right to be free from race discrimination" and Paragraph 2 asserts that the "action arises from the racially and religious-based discriminatory conduct of the Defendants when . . . [they] denied common carrier services and unlawfully removed [Dr. Goldman] from [Flight 4302] because of [his] Jewish race and/or religion." (Doc. No. 1 at PageID# 3, ¶¶ 1-2.) Neither includes any factual content except to the extent that Dr. Goldman was "removed from a flight[,]" which his other well-pled allegations already demonstrate. It is merely a legal conclusion that this was "unlawful[]" and "because of [his] Jewish race and/or religion." (*Id.*) Paragraph 6 simply describes Defendants' "discriminatory and retaliatory conduct" as "knowing, malicious, willful and wanton and/or show[ing] a reckless disregard for Plaintiff's rights, warranting an award of punitive damages" and lists some of the resulting damages he claims to have suffered as a result of that conduct, which is a conclusory attribution of Defendants' subjective motivations. (*Id.* at PageID# 4, ¶ 6.)

Paragraphs 77, 78, and 79 of Dr. Goldman's Complaint are conclusory because they conclude that Defendants' motivations "did not involve a safety concern, but rather was an arbitrary and capricious decision motivated by racial and religious animus[,]" which merely recites the motivation necessary to state a § 1981 claim for intentional discrimination on the basis of race. (Doc. No. 1 at PageID#s 17-18, ¶¶ 77-79.) Paragrah 80 is also conclusory because Dr. Goldman simply asserts that he was ejected from Flight 4302 "not for any legitimate reason(s) related to safety and/or security" but because of Defendants' "racial and/or religious prejudice against [him] for being Jewish[,] exercising his religious beliefs[,] [and] their complete lack of sensitivity to Dr. Goldman's religious needs[.]" (*Id.* at PageID# 18, ¶ 80.) Paragraph 81 merely contains an assertion that Defendants were "malicious, oppressive and/or in reckless disregard of [his] rights, thus entitling [him] to punitive damages and/or attorney fees," and is therefore conclusory; and Paragraph 82 serves only to attribute

vicarious liability to American Airlines, AAG, Republic, and Republic Airways Holdings.  (*Id.*, ¶¶ 81-82.)

Paragraphs 84[10] and 85 describe Dr. Goldman's legal right to equal treatment under § 1981, and Paragraph 86 continues with legal conclusions that Defendants "violated [his] civil rights by denying him equal treatment in making and enforcing his contract[,]" which is a mere recital of the third element of a § 1981 claim.  (*Id.* at PageID#s 19, ¶¶ 84-86.)  In Paragraph 87, he continues to assert bare legal conclusions about Defendants' true motivations: that Defendants "intentionally, purposefully, and maliciously discriminated against [him] . . . for no wrong but for being Jewish, adhering to his Jewish faith, and for reasonably requesting that he not be forced to place his Jewish religious articles on the floor or underneath the airplane[.]"  (*Id.* at PageID#s 19-20, ¶ 87.)

Paragraph 88 begins by conclusorily describing Defendants as "liable for [their] religious and racially charged discriminatory conduct and actions" because they "had no legitimate reason or justification to remove Dr. Goldman from the flight."  (*Id.* at PageID# 20, ¶ 88.)  However, the Court must credit Dr. Goldman's allegation that Defendants "made false allegations relating to Dr. Goldman and/or lied by stating that Dr. Goldman and/or the placement of his briefcase presented a safety issue" but not his subsequent leap to his legal conclusion that "[i]n fact, the truth was that Dr. Goldman's removal from the aircraft was for racial and religious discriminatory reasons."  (*Id.*, ¶ 88.)  Paragraph 89 repeats verbatim his legal conclusions from Paragraph 81, and Paragraph 90 only references the categories of alleged damages resulting from the events on Flight 4302.  (*Id.* at PageID# 20-21, ¶¶ 81, 89-90.)

Thus, whether based on religious or racial discrimination, the allegations contained in Paragraphs 1-2, 6, and with the exception of the allegations in paragraph 88, the allegations contained

---

[10] Paragraph 83 incorporates all previous allegations but does not include any new allegations.  (*Id.* at PageID# 19, ¶ 83.)

in Paragrains 77-90 are not entitled to the "assumption of truth" because they are mere legal conclusions. *See Washington v. Sodecia Auto.*, 2025 WL 2965835 at *2 (6th Cir. Oct. 21, 2025) (citing *Iqbal*, 556 U.S. at 678) ("Conclusory allegations are not entitled to the assumption of truth."). Accordingly, the Court must analyze Dr. Goldman's well-pled factual allegations to determine whether he has stated a plausible claim for relief for intentional discrimination on the basis of race under § 1981.

### c) Analysis

It well-established that "a complaint that pleads facts that are merely consistent with liability will be deemed insufficient in the face of a motion to dismiss." 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (4th ed. 2025). "As the Sixth Circuit has said, when an obvious (and lawful) explanation exists for factual allegations of claimed illegality, the allegations have not moved the needle from 'possible and conceivable' to 'plausible and cognizable.'" *Tenn. State Conference of the NAACP v. Lee*, 746 F. Supp. 3d 473, 492 (M.D. Tenn. 2024) (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022)).[11] And in the context of a discrimination claim, Chief Judge Sutton has explained that

> [i]f a plaintiff's claim is plausible, the availability of other explanations—even more likely explanations—does not bar the door to discovery. But you can't assess the plausibility of an inference in a vacuum. The reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations . . . Where, as here, the complaint alleges facts that are merely consistent with liability . . . as opposed to facts that demonstrate discriminatory intent . . . , the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made.

5B Wright & Miller § 1357 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013) (Sutton, J.)). "As the Sixth Circuit has repeatedly explained, 'a complaint

---

[11] *See also id.* (quoting *Iqbal*, 556 U.S. at 682 (citation omitted)) ("Since *Twombly*, countless courts have dismissed complaints because they failed to rebut an 'obvious alternative explanation'—that is, an explanation for complained-of conduct that involved no wrongdoing.").

that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief.'" *St. John v. Univ. Hosps. Cleveland Med. Ctr.*, 2025 WL 2969274 at *4 (N.D. Ohio Oct. 21, 2025) (quoting *Nali v. Ekman*, 355 Fed. Appx. 909, 913 (6th Cir. 2009)).  Thus, to survive, Dr. Goldman's Complaint must set forth well-pled "facts that demonstrate discriminatory intent[.]"  *Southfield*, 727 F.3d at 505.

In *Southfield*, an Iraqi-born US citizen, Samir Danou, brought a claim under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, against Flagstar Bank for discriminating against his family's real estate venture partnership (Southfield) on the basis of his national origin.  *See* 727 F.3d at 503.  The Sixth Circuit affirmed the district court's dismissal of its claim because Southfield did not "ple[ad] sufficient facts to raise a plausible inference of discrimination[.]"  *Id.*  There, Flagstar had loaned money to Southfield to invest in real estate, but Southfield failed to timely repay its loan, so the parties restructured the loan agreement.  *Id.*  When Danou requested another extension on behalf of Southfield, Flagstar "refused to provide an application" despite "Danou offering additional collateral and his wife's guarantee.  Danou asked for an explanation for the decision but Flagstar refused to give one."  *Id.*

The court held that Danou's allegations of "being Iraqi and being denied a loan extension" were "merely consistent with liability[,]" but his complaint did not include "facts that demonstrate discriminatory intent" such as "disparate impact or direct evidence[,]" and did not "identif[y] any similarly situated individuals whom Flagstar treated better."  *Id.* at 505-06.  Instead, the "obvious alternative explanation" for Flagstar's refusal to extend additional credit to Southfield was not, as Danou claimed, his identity as an Iraqi-American, but Flagstar's "understandable concern about repayment."  *Id.* at 505 (citing *Iqbal*, 556 U.S. at 682 and *Twombly*, 550 U.S. at 567) ("Common sense suggests that Flagstar denied Southfield's request for a further extension because it thought the

extension was a bad business proposition, not because it wanted to discriminate against people of Iraqi origin.").

In *Han v. Univ. of Dayton*, 541 Fed. Appx. 662 (6th Cir. 2013), the court also affirmed the district court's dismissal of an Asian-American law professor's § 1981 claim against his former employer. Han "provide[d] no facts that would allow a court to infer that the adverse employment action at issue was a result of his race or gender" even though he alleged that he was replaced by a white male and that he "was treated less-favorably than other similarly situated female employees" because he did not "offer[] [any] specifics regarding who those employees were or how they were treated differently." *Id.* at 627.

AAI and the AAI Employees cite to *Ray v. Am. Airlines, Inc.*, 755 F. Supp. 3d 1277 (C.D. Cal. 2024). In that case, the court applied *Iqbal*'s plausibility standard to dismiss a § 1981 claim arising from an analogous disagreement between a black, male passenger and a flight attendant. In *Ray*, the court described the plaintiff's well-pled allegations as follows:

> After the flight had taken off and was in the air, plaintiff used his 'personal camera' to record video of the clouds outside. He then began to test the zoom feature with the camera pointed at the front of his seat and focused on nothing specifically. Noticing his camera use, a flight attendant (described as South Asian) told plaintiff that it was 'illegal' to record anything inside the plane and instructed him to delete such recordings under American Airlines policy. But plaintiff questioned whether such a rule existed and denied filming inside the cabin anyway. He did not raise his voice, curse, or move from his seat. Still, the flight attendant became visibly angry and left to notify the pilot. Shortly after, with no announcement or warning, the plane began to descend. That sudden change caused plaintiff to deduce that the flight attendant must have told the pilot to make an emergency landing. The plane indeed soon landed at the Phoenix airport, where plaintiff was forced to deplane with no explanation. Armed security personnel then surrounded plaintiff and told him that the pilot had grounded the plane to have him removed as a danger to others. When plaintiff tried to explain that he had done nothing wrong, no one listened. He was denied credit for the rest of his booked flight and barred from taking another American Airlines flight.

*Id.* at 1278-79 (internal citations omitted). In short, Ray set forth well-pled allegations that he was singled out during the flight for using a camera, falsely accused of disruptively taking photos, and

inexplicably removed from the aircraft for what he alleged were racially discriminatory reasons.  *See id.*

The court provided two relevant justifications for dismissing Ray's § 1981 claim.  First, the court held that Ray had not "alleged enough facts plausibly suggesting that his contentious interaction with the flight attendenant (which precipitated the grounding of his flight and removal from the plane) was motivated by racial animus."  *Id.* at 1280.  Instead, Ray's allegations "suggest[ed] no more than the 'sheer possibility' that the flight attendant escalated that interaction on account of his race."  *Id.* at 1281 (quoting *Iqbal*, 556 U.S. at 678).  "Besides the undisputed fact that plaintiff is African American[,]" the court observed, "there is no other allegation concerning race—much less suggestive of racial animus—anywhere else in the FAC.  Nothing, for instance, is alleged about the flight attendant referencing plaintiff's race, making racially charged comments, or treating other non-African American passengers differently when they used cameras in similar ways as plaintiff."  *Id.* at 1281.  The court in *Ray* therefore held it could not reasonably infer "racial animus" "just because of the flight attendant's purportedly unjustified and outsized reaction to his camera use—allegedly leading, in turn, to the wildly disproportionate response of an emergency landing midflight."  *Id.*  The court then explained that while it could not "rule out the possibility of the flight attendant's racial animus toward plaintiff, the FAC's intrinsic allegations cannot exclude the alternative possibility that plaintiff was just badly mistreated by an ill-informed and over-zealous flight attendant."  *Id.* at 1282.

Second, the court held that the necessary but-for cause between his race and his removal from the plane was missing.  *Id.*  In its analysis, the court assumed that the "flight attendant . . . cast plaintiff's behavior in the worst possible light [to the pilot]" and "perhaps the flight attendant even lied about the danger that plaintiff presented onboard[.]"  *Id.* at 1283.  Still, the court held that those allegations did not warrant "the inferential leap that the pilot removed plaintiff in the exercise of his

24

exclusive authority to do so because of plaintiff's race rather than because of a perceived threat to flight or passenger safety—*even if that threat were contrived and conveyed under false pretenses by the flight attendant*."  *Id.* at 1283 (emphasis added).

AAI and the AAI Employees also cite to *Miao v. United Airlines, Inc.*, 2025 WL 843755 at *4 (N.D. Ill. Mar. 18, 2025), *appeal filed*, Case No. 25-1649 (7th Cir. Apr. 17, 2025).  As in that case, "the essence of this litigation involves the placement of carry-on bags and who decides where they must be placed."  In *Miao*, the court dismissed the passenger's § 1981 claim where he asserted the following well-pled allegations:

> During the boarding process, a flight attendant asked Miao to remove his lunchbox from the overhead storage compartment and to place it under his seat.  Instead, Miao placed the lunchbox on the empty seat beside him.  This prompted the flight attendant to ask Miao again to put the lunchbox underneath his seat.  Miao informed the flight attendant that since the lunchbox had food, he wanted to wait until the other passenger arrived to place the food under his chair.  When the flight attendant asked Miao to put the lunchbox under his seat a third time, he complied.  Shortly after, a supervisor approached Miao and informed him that he needed to be removed from the plane because the flight attendant claimed that Miao hit her.  Miao denied the allegations but exited the aircraft without issue.
>
> During this time, another Caucasian passenger had a similar sized bag in the overhead storage bin. The Caucasian passenger was not approached by a flight attendant or removed from the aircraft.

*Id.* at *1.  Miao, the court noted, did "allege that other non-Asian passengers with similar bags were not asked to remove them from the overhead bin or removed from the flight."  *Id.* at *4.  But the court quickly denied that such non-Asian passengers counted as sufficient comparators because "[t]he Complaint makes no allegation that the non-Asian passengers *also* disobeyed direct instructions."  *Id.* (emphasis added).  The court underscored that "[t]he only reasonable inference to be drawn in this case, supplied principally by Miao's own conduct as outlined in his Complaint, is that he was not the victim of discrimination of any kind . . . the Caucasian passenger is not alleged to have ignored or

25

otherwise defied instructions from a flight attendant, permitting racial discrimination to be inferred in their better treatment." *Id.* at *5.

Taken together, *Southfield*, *Han*, and *Ray* instruct that under *Iqbal*'s plausibility standard, a "perceived threat to flight or passenger safety" can be an "obvious alternative explanation" to racial animus that "simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made." *See Ray*, 755 F. Supp. 3d at 1282-83; *Southfield*, 727 F.3d at 505; 5B Wright & Miller § 1357.  And *Miao*'s reasoning suggests that a court could infer a flight attendant's racial motivation in targeting a passenger for mistreatement if the passenger could point to a white comparator who had also "defied instructions from a flight attendant" but was not met with disciplinary sanctions.  *See Miao*, 2025 WL 843755 at *4-5.

Applying these principles, and for the reasons set forth below, the Court concludes that none of the seven (7) well-pled incidents Dr. Goldman alleges meets *Iqbal*'s plausibility pleading standard to assert a claim based on Defendants' alleged animus against Dr. Goldman for his Jewish racial identity.

### (1)  Powell and Ford's initial instruction that Dr. Goldman check his carry-on bag at the gate

Powell's instruction that Dr. Goldman check his carry-on bag at the gate does not plausibly suggest that she intentionally discriminated against Dr. Goldman based on his Jewish racial identity. He expressly admits this: "*Because he was one of the last people to board the plane*, Dr. Goldman was told by gate agent Defendant Powell that he would have to check his carry-on bag." (Doc. No. 1 at PageID# 11 ¶¶ 39, 41.)  Dr. Goldman himself has already provided the non-discriminatory explanation for her request.  It was "because he was one of the last people to board the plane" not because he was Jewish.  (*Id.*)

Next, Dr. Goldman does not even allege that he communicated the religious significance, or, for that matter, the Jewish nature of his valuable items to Powell.  He pleads: "Given the fact that Dr. Goldman had medication, religious items (including his Hebrew prayer book, prayer shawl, phylacteries), and valuables in his carry-on, [he] kindly requested if there was any way to see if there was any space for his carry on." (*Id.*)  This allegation explains *his* personal motivation for making the request based upon his practice of Judaism, but he does not allege that he revealed that religious motivation to Powell or Ford.  Ford then "cut in" and "told him he could either remove valuable items from the bag or he would have to rebook his flight for the following day." (*Id.*)  There is no allegation that they made any racial or religious comment or reacted in a hostile way to him except for the vague reference to "cut in." (*Id.*)  And rather than reveal a racial animus, he removed his religious items and valuables "with Defendant Ford and/or Defendant Powell's *approval*[.]" (*Id.* at PageID# 12, ¶ 42) (emphasis added).  In other words, they requested that he transfer his valuable items *so that he could bring them with him*, and they explicitly "approv[ed]" of this plan. (*Id.*)

There is nothing about this interaction that suggests that they acted upon a hidden racial motivation for their obviously logistical request, and Dr. Goldman himself explains it as based on his status as one of the last passengers to arrive at the gate.[12]

> **(2)  After boarding Flight 4302, the Flight Staff's denial of his request that they reverse Powell and Ford's initial decision by allowing him to place his carry-on bag in the overhead bin compartment in First Class**

Once he boarded Flight 4302, he "observed vacant space in the overhead bin compartments in the First-Class section[.]" (*Id.* at PageID# 12, ¶ 44.)  He then asked the Flight Staff if he could place his carry-on bag in that compartment, and although they denied his request, his own allegations

---

[12] At this point, all three individuals (Ford, Powell, and Dr. Goldman) are at the gate, not on the plane, so none of them can yet observe the "vacant space in the overhead bin compartments in the First-Class section[.]" (*Id.* at PageID# 12, ¶ 44.)

provide a non-racial explanation for why the Flight Staff could not accommodate that request: "Defendant Ford and/or Defendant Powell responded that a certain number of bags had already been placed in the overhead bin compartments and they would be unable to place another carry-on in the overhead bin compartments." (*Id.* at PageID# 13, ¶ 44.)  In Dr. Goldman's Opposition to the Republic Defendants' Motion, he claims that the Flight Staff "*falsely* claim[ed] that a certain number of bags had already been placed in the overhead bins."  In contrast, in his Complaint, Dr. Goldman merely asserted that he observed "vacant space" in the overhead bin.  (Doc. No. 34 at PageID# 362) (emphasis added).  However, Dr. Goldman cannot use his Opposition brief to amend his Complaint to allege that the Flight Staff's comment regarding the number of bags in the overhead bin was false. *See Am. Ass'n of Nurse Anesthesiology v. Kennedy*, 2025 WL 2459208 at *5 (N.D. Ohio Aug. 26, 2025) (Barker, J.) (quoting *Kelly v. Valeo N. Am., Inc.*, 2025 WL 933943 at *5 (E.D. Mich. Mar. 27, 2025) and *Becton v. Corrs. Corp. of Am.*, 2017 WL 1461632 at *2 (M.D. Tenn. Mar. 28, 2017)) ("[A] plaintiff may not amend his complaint by adding factual allegations as a part of a response in opposition to a motion to dismiss."); *Bryant v. Collins*, 2025 WL 2840755 at *6 (N.D. Ohio Oct. 7, 2025) (Barker, J.) ("[A]n opposition brief is not the proper procedural vehicle for amending a pleading.") (collecting cases).

Assume, however, that Ford and Powell were wrong about the precise availability of space or his right to place his carry-on items in the overhead bin.  Still, he does not suggest what it was about their mistaken estimation of the available luggage space that could have been based on religious or racial animosity against him as a Jewish person.  *See Ray*, 755 F. Supp. 3d at 1282 (holding that the passenger being "badly mistreated by an ill-informed and over-zealous flight attendant" did not plausibly suggest racial discriminatory motives).  Thus, this incident also does not suggest any

28

plausible inference that the Flight Staff denied his second requent based on animus against Dr. Goldman for his Jewish racial identity.

> **(3)      Captain Pino's decision to eject Dr. Goldman based on the Flight Staff's "false allegations"**

At that point, after being instructed that he could not place his *carry-on* bag in the First-Class section, he placed his *briefcase* (i.e., his personal item) in the overhead bin. (*Id.*, ¶ 46.) He was never told that he "could not place his *briefcase*" in the First Class section, "nor were there any signs" to that effect. (*Id.*, ¶ 45.) After the above incidents (none of which plausibly indicate any racial animus), Dr. Goldman claims that the Flight Staff then "falsely advised" Captain Pino of four (4) allegations against him: he "was walking up and down the jetway four to five times, blocking other passengers from getting on the plane, refusing to go to his seat, telling people around him that this was Anti-Semitic and a terrorist type of activity that the gate agents and flight attendants were doing to him[.]"[13] (*Id.* at PageID#s 13-14, ¶¶ 48-49.)

First, even assuming as the court did in *Ray*, that the Flight Staff had "cast plaintiff's behavior in the worst possible light [to the pilot]" and "even lied about the danger that plaintiff presented onboard," that would not permit "the inferential leap that the pilot removed plaintiff in the exercise of his exclusive authority to do so because of plaintiff's race rather than because of a perceived threat to flight or passenger safety—even if that threat were contrived and conveyed under false pretenses by the flight attendant." 755 F. Supp. 3d at 1283. The inference Dr. Goldman seems to be asking the Court to make is that a lie based in the Flight Staff's animus towards Jewish people caused Captain Pino to remove him; yet there is nothing about *Captain Pino*'s subsequent decision to eject Dr. Goldman that suggests *he* made this decision out of racial animus, and therefore nothing to suggest

---

[13] He claims that the Flight Staff may have "made other false allegations against him" but does not specify what those were. (*Id.*)

that his ejection was caused by racial animus. Not only is the Complaint devoid of facts suggesting that the Flight Staff decided to fabricate those allegations *because* he was Jewish, but like in *Ray*, the obvious alternative explanation for Captain Pino's decision was that he was concerned about a passenger causing a scene by "walking up and down the jetway four to five times, blocking other passengers from getting on the plane, refusing to go to his seat" and complaining "that this was anti-Semitic" and a "terrorist type activity" on an airplane, which prompted Captain Pino's concern for passenger safety. *See id.*

Second, the Flight Staff's alleged "fabricated" allegation that Dr. Goldman was "telling people around him that this was Anti-Semitic [] activity" is either consistent with what Dr. Goldman himself alleges he had been doing up until that point or defeats his claim altogether. It is still unclear from his Complaint whether he had ever revealed the Judaic basis of his request for alternative bag placement by the time the Flight Staff decided to fabricate their allegations against Dr. Goldman. But either way, his claim fails. Assuming he did reveal it, a flight attendant relaying to the pilot that a passenger was complaining about anti-Semitic treatment does not suggest anti-Semitism if that is, in fact, what he was complaining of. He had "turned back to [Ford or Powell] who was standing at the entrance of the aircraft and respectfully requested that he be able to place his carry-on in the overhead bin compartments in first class[,]" he (by assumption) revealed his concern about "placing his Jewish religious articles on the floor[,]" and they still denied it due to "their complete lack of sensitivity to Dr. Goldman's [Jewish] religious needs[.]" (*Id.* at PageID#s, 12-13, ¶¶ 44, 47; *id.* at PageID# 18, ¶ 80.) Apparently, "anti-Semitism" *is* precisely what he had been complaining of. *See, e.g.*, *Stand With US Center for Legal Justice. v. Mass. Inst. of Tech.*, 158 F.4th 1, 17 n.13 (1st Cir. 2025) (quoting *anti-Semitism*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/antisemitism (last visited Dec. 18, 2025)) (defining "anti-Semitism" as

"hostility toward or discrimination against Jews as a religious, ethnic, or racial group").  So although he claims this allegation was false, his own complaints about the Flight Staff's failure to accomodate his Jewish religious needs belies that assertion because it counts as "telling people around him that this was Anti-Semitic . . . activity that the gate agents and flight attendants were doing to him[.]"(*Id.* at PageID#s 13-14, ¶ 48-49.)

Alternatively, assuming he had not at that point revealed the Judaic basis of his request, then the Flight Staff would have been left guessing at *why* he was so insistent on placing his luggage in that area of the plane.  In that case too, his allegations provide no plausible basis to infer that the Flight Staff decided to cause him to be ejected *because* he was "adhering to his Jewish faith" as they would not have even known about his Jewish religious needs. (Doc. No. 35 at PageID#388.) Put differently, either the Flight Staff  accurately relayed to Captain Pino that the altercation stemmed from the Flight Staff insensitively denying his request to adhere to his Jewish religious needs ("telling people around him that this was Anti-Semitic. . . activity"), or the Flight Staff were not aware that his concern had anything to do with him being Jewish or practicing Judaism.

Either scenario, therefore, renders implausible his theory that the Flight Staff concocted those allegations to cause him to be ejected from the plane *because* he was Jewish, rather than simply because he was a difficult passenger whom they observed insisting on placing his luggage in a particular area of the aircraft.

          **(4)**     **The Flight Staff's and CPD's unsuccessful attempt to execute Captain Pino's orders to remove Dr. Goldman from Flight 4302**

All of the events following Captain Pino's decision to eject Dr. Goldman show that he repeatedly refused to obey Pino's order, and the Flight Staff's and CPD's attempts to execute that order.  (Doc. No. 1 at PageID#s 14-15, ¶¶ 51-59.)  The Flight Staff "appeared at [his] seat and demanded that he exit the aircraft" and when he asked "why [they] were demanding that he leave the

31

aircraft[,]" they simply "responded by stating Dr. Goldman had to get off the aircraft now." (*Id.* at PageID# 14, ¶¶ 51-53.) Instead of complying, he "again asked why he had to get off the plane" at which point they "threatened to call the police." (*Id.*) ("Up until this point, Dr. Goldman had never left his seat."). The threat to call the police was still insufficient to prompt Dr. Goldman's compliance, and he "remained in his seat." (*Id.*, ¶ 55.)

Critically, although Dr. Goldman asks the Court to infer a racial motivation from Defendants' conduct to this point in his Complaint—even he alleges that he had no reason to suspect a racial motivation: "To this point, Dr. Goldman still had no knowledge as to why [the Flight Staff] were demanding that he exit the aircraft." (*Id.* at PageID# 15, ¶ 54.) And still, Dr. Goldman provides no allegations plausibly suggesting that the Flight Staff and CPD's attempts to execute Captain Pino's order were based in animus against Jewish people, rather than based on the obvious alternative explanation that they were undertaking their legal obligation to follow Captain Pino's order. *See* 14 C.F.R. § 121.533(d) ("Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane."); *Id.* § 121.533(e) (" Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.").

Again, when the CPD Officer "told him he had to exit the aircraft[,]" Dr. Goldman did not do it, and instead, he "asked why he has to exit the aircraft" and "continued to ask in a calm manner why he was being forced to leave the aircraft[.]" (*Id.*, ¶¶ 56-58.) "Dr. Goldman remained on the aircraft in his seat." (*Id.*, ¶ 59.) This too provides no basis for the Court to infer that the CPD Officer was motivated by racial animus in following Captain Pino's order to remove him. And even if Dr.

32

Goldman had attempted to set forth such allegations, he does not name the CPD or that particular officer as a defendant liable for that conduct.

### (5)    Dr. Goldman and Rabbi Marozov's interaction with Captain Pino and the order to deplane

Despite refusing to obey Captain Pino's removal order at the repeated behest of the Flight Staff and the CPD, Dr. Goldman and Rabbi Marozov thought it advisable to "[go] to the front of the aircraft" to ask Captain Pino "why Dr. Goldman was being removed from the flight." (*Id.*, ¶¶ 60-61.) Rather than reveal any animus against Jewish people, he simply responded that the Flight Staff had "told him that a passenger [] had to be removed." (*Id.* at PageID# 16, ¶ 62.)  Dr. Goldman again asked "why [the Flight Staff] wanted a passenger [] removed" and "if there was anything he did wrong and if so, [] attempted to apologize." (*Id.*, ¶ 63.)

Captain Pino's response to Dr. Goldman's and Rabbi Marozov's inquiry did not plausibly evince any racial motivation: he explained that "now that passengers were being deplaned, there is no way the flight can take off with Dr. Goldman on the aircraft." (*Id.*, ¶ 65.)  Thus, this incident too does not plausibly set forth allegations indicating that Captain Pino acted with racial animus.

### (6)    Dr. Goldman's arrest at the gate and Rabbi Marozov's inability to reenter the airplane

Dr. Goldman's arrest at the gate also does not suggest the Defendants acted with racial animus.  All Dr. Goldman alleges is that a "a Supervisor of the Cleveland Division of Police spoke with Defendant Powell" and then "the Cleveland Division of Police Officer approached Dr. Goldman and placed him under arrest." (*Id.*, ¶¶ 68-69.)  Dr. Goldman appears to suggest that the Court can plausibly infer Powell's racial animus from a conversation he did not overhear simply because he was subsequently arrested.  But the "obvious alternative explanation" is that Powell explained what had just happened: Dr. Goldman's insisted on placing his luggage in First Class and several times refused to follow Captain Pino's removal order despite the Flight Staff's and CPD Officers' repeated

requests that he do so.  He again provides no reason to think his arrest was based on animus against Jewish people rather than due to his placement of his briefcase in First Class and his multiple refusals to follow orders to exit the plane.

True, Dr. Goldman does allege that "the ***officers*** did not allow Yossi Marozov, a visibly Orthodox Jew, to reboard the aircraft" but he does not allege, even 'on information and belief,' that Powell or any Defendant ever asked them to do that.  (Doc. No. 1 at PageID# 16, ¶ 70) (emphasis added).  But even if Powell or any Defendant had so asked, Dr. Goldman provides no reason to conclude that it was because Rabbi Marozov was Jewish rather than because he encouraged Dr. Goldman to resist Captain Pino's removal order and, just like Dr. Goldman, approached Captain Pino "to ask [] why Dr. Goldman was being removed from the flight."  (*Id.* at PageID#s 15-16, ¶¶ 60-61, 70.)  Finally, as noted above, the "officers" are not named as defendants so even if *they* had singled out Rabbi Marozov purely for being Jewish (rather than due to his voluntary association with the individual target of their arrest), Dr. Goldman cannot plausibly attribute their discriminatory intent to Powell or the other Defendants.

To elucidate the basis for this Court's conclusion that the non-defendant officers' refusal to allow Rabbi Marozov to reboard does not support an inference of Defendants' discriminatory intent, consider the following counterexample to *Southfield*. In *El-Hallani v. Huntington Nat'l Bank*, 623 Fed. Appx. 730 (6th Cir. 2015), the court reversed the district court's dismissal of Arab-American plaintiffs' § 1981 claims for sudden mass closure of their bank accounts.  The court specifically identified "the key allegations that made Plaintiffs' claims plausible" as

> (1) the affidavit from a former Huntington employee describing account closures, and (2) the apparent illogic of willy-nilly cancelling business accounts.  Identifying a sizable group of similarly affected people makes it less likely that Plaintiffs El-Hallani and Manuaeel share some additional characteristic other than their race or ethnicity that caused Huntington to close their accounts, and makes it more likely that the decision

34

to close El-Hallani's and Manuaeel's accounts was due to some systematic policy of Huntington.

*Id.* at 736-37.  The affiant averred "that from 2008 to 2009, Huntington's headquarters sent quarterly lists of Arab-owned business accounts to close[,]" "that Huntington closed associated personal accounts including those held by family members of business owners when the business accounts were closed[,]" "estimate[d] that from 2008 to 2009, Huntington closed over 200 business accounts[,]" and "attest[ed] that the Huntington branch he worked at 'had many non-Middle Eastern bank account holders that were similar in many respects, only differing by the Arab, or Middle Eastern characteristics, which were not closed during this period.'" *Id.* (cleaned up).  Unlike in *Southfield*, the court explained, this affidavit "offer[ed] some support for Plaintiff's claims and pushes them towards plausibility." *Id.* at 737.

Unlike the plaintiffs in *El-Hallani*, Dr. Goldman does not include anything like an insider's affidavit describing Defendants' policy of targeting Jewish passengers.  In *El-Hallani*, it was the absence of an "additional characteristic" between the Arab-American plaintiffs (e.g., poor credit or a history of missed payments) that supported the plausibility of the inference that their common racial identity as Arab-Americans prompted Huntington to close their accounts.   623 Fed. Appx. at 737. Yet here, the "additional characteristic" that Rabbi Marozov and Dr. Goldman share is obvious from the face of the Complaint: they are the only two passengers who approached Captain Pino to extract an explanation for Dr. Goldman's removal after Dr. Goldman continued to remain in his seat.

In short, the non-defendant officers' refusal to allow Rabbi Marozov to reboard after a ten-minute discussion with Powell is not a "fact[] that demonstrate[s] [Defendants'] discriminatory intent" through "disparate impact or direct evidence[.]" *Southfield*, 727 F.3d at 505.  Therefore, this incident also does not plausibly suggest the Defendants discriminated against Dr. Goldman based on his Jewish racial identity.

### (7)    Dr. Goldman's incarceration

Finally, Dr. Goldman's allegations regarding his later incarceration do not provide any reasonable basis for the court to conclude that Defendants' discriminated against Dr. Goldman on the basis of his Jewish racial identity. (*Id.* at PageID# 17, ¶¶ 71-76.)

As noted above, to state a § 1981 claim, "[r]ace must be the actual cause, as opposed to being just a motivating factor, of the loss of a contractual right." *Bloomer*, 785 F. Supp. 3d at  267 (citing *Comcast*, 589 U.S. at 332).[14]  Even assuming that the jail officers' and inmates' actions were racially motivated, those actions cannot support liability.  The jail officers' and inmates' alleged race-based actions cannot have been the but-for cause of the impairment of Dr. Goldman's contractual right because their actions occurred *after* the alleged contractual impairment by Defendants.  (Doc. No. 1 at PageID# 19, ¶ 86.)  (Defendants "violated Plaintiff's civil right by denying him equal treatment in making and enforcing his contract with American and/or American Airlines Group.").

Therefore, the events surrounding his incarceration also do not plausibly support an inference that Defendants intentionally discriminated against him on the basis of his Jewish racial identity.

In summary, none of the well-pled allegations Dr. Goldman points to, either invidiually or taken together, supports a plausible inference that Defendants "intended to discriminate against him on the basis of race[,]" so he has failed to state a claim under § 1981.  *Amini*, 440 F.3d at 358.

### 2.    Contractual Impairment

In their Reply, the Republic Defendants argue that they "did not impair Plaintiff's right under his contract with American Airlines" because his own disobedience impaired his contractual rights, not the Republic Defendants' actions.  (Doc. No. 45 at PageID#s 500-03.)  This argument attacks the third element of Dr. Goldman's § 1981 claim (impairment of a right to contract), not the second

---

[14] Actual cause is synonymous with but-for cause.  *Cause*, Black's Law Dictionary (12th ed. 2024).

(discrimination on the basis of race).  However, this Court will not consider an argument raised for the first time in a Reply.  *See Jemison v. AFIMAC Glob.*, 645 F. Supp. 3d 781, 801 (N.D. Ohio 2022) (Barker, J.) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)) ("It is well established that courts will not normally consider issues raised for the first time in Reply Briefs, as it deprives the non-movant of a full and fair opportunity to respond."). Therefore, the Court will not evaluate this argument.

### 3.  Permissive Refusal Defense under 49 U.S.C. § 44902(b)

AAI and the AAI Employees assert 49 U.S.C. § 44902(b) as an affirmative defense to Dr. Goldman's § 1981 claim on the basis that his allegations indicate that he presented a possible safety concern.  (Doc. No. 26 at PageID# 255.)  Citing to *Al-Qudhai'een v. Am. West Airlines*, 267 F. Supp. 2d 841 (S.D. Ohio 2003) and *Cerqueira v. Am. Airlines*, 520 F.3d 1 (1st Cir. 2008), they claim that § 44902(b) bestows on captains the "broad discretion" to refuse to transport passengers without undertaking a thorough investigation, allows captains the right to rely on information provided by airline employees, and protects even "mistaken decisions" "so long as they are not arbitrary and capricious." (*Id.*)  (citing *Cerqueira*, 520 F.3d at 15).

Dr. Goldman resists this conclusion.  He argues that his § 1981 claim survives because he "alleges no legitimate safety concern existed; AAI's accusations were pretextual, and he engaged in no disruptive conduct, only seeking to protect his religious items."  (Doc. No. 35 at PageID# 388.) He agrees that § 44902(b) prevents arbitrary and capricious removals.  (*Id.*)  He intimates that *Al-Qudhai'een* supports his argument that his removal was arbitrary and capricious.  (*Id.*)  According to Dr. Goldman, "where removal is motivated by discriminatory animus rather than genuine safety concerns, the statutory defense does not apply."  (Doc. No. 36 at PageID# 410.)  It was the "false

nature of the [Flight Staff's] accusations against Dr. Goldman" to Captain Pino that "demonstrate[]
that safety was not the true motivation for the Defendants' actions." (*Id.* at PageID# 411.)

In their Reply, AAI and the AAI Employees reiterate that he failed to comply with the Flight
Staff's instructions when they asked him not to place his carry-on in First Class but he placed his
briefcase there, and when he failed to exit the aircraft despite orders to do so. (Doc. No. 42 at PageID#
476.) Those allegations, they claim, demonstrate that he was "inimical to safety" under § 44902(b),
and therefore subject to permissive refusal. They also respond that Dr. Goldman has misread *Al-
Qudhai'een* because the court in that case noted that the pilot's reliance on false allegations did *not*
support the conclusion that the passenger's removal was arbitrary and capricious. (Doc. No. 42 at
PageID# 476.)

According to the Court's own research, the Sixth Circuit has not weighed in on the application
of § 44902(b) as a defense to § 1981 claims. Nevertheless, the Court is persuaded that the statute
provides an independent basis for dismissal of Dr. Goldman's § 1981 claim because none of his well-
pled allegations plausibly demonstrate that Captain Pino's determination that he "*might* be[] inimical
to safety" was arbitrary and capricious. 42 U.S.C. § 44902(b) (emphasis added).

Section 44902, titled "Refusal to transport passengers and property," provides in relevant part
that "Subject to the regulations of the Administrator of the Transportation Security Administration,
an air carrier, instrastate air carrier, or foreign air carrier may refuse to transport a passenger or
property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902(b) (titled
"Permissive refusal").

In *Al-Qudhai'een*, the court granted summary judgment in favor of Defendant American West
Airlines and its individual flight staff members and against two Saudi Arabian citizens' § 1981 claims.
*See* 267 F. Supp. 2d at 848. The plaintiffs filed their § 1981 claims for "allegedly relay[ing] false

information based on racial stereotypes" to the captain, which caused their "unlawful harassment and detention[.]"  *Id.* at 844.  There, Plaintiff Al-Qudhai'een asked one of the flight attendants if the other plaintiff, Al-Shalawi, could "sit in the empty seat next to him" but he was "instructed that he would have to wait until the plane was airborne."  *Id.* at 843.   Despite that instruction, "Al-Qudhai'een decided to get up from his seat and tell Al-Shalawi to come sit next to him."  *Id.*  Al-Shalawi moved seats, but did not "do anything defendants considered suspicious."  *Id.*  Al-Qudhai'een noticed that the plane's lavatory for economy customers had developed a line, so he asked one of the flight attendants if he could use the first class bathroom, and she denied his request.  *Id.* at 844. Al-Qudhai'een claimed he returned to his seat, although another flight attendant testified that Al-Qudhai'een had asked him a series of logistical questions about the flight.  *Id.*  Then,

> [a]fter some discussion between the flight attendants regarding plaintiffs' behavior, they decided to inform Captain Patterson that plaintiff had asked similar questions about the flight to two different flight attendants, plaintiff disobeyed the flight attendant's order to remain in his seat, and plaintiff attempted to get into the cockpit. Flight attendant De Campo also mentioned to Captain Patterson that plaintiffs were Arab and plaintiffs believe that defendants relied on this information to justify the allegation that plaintiffs were hijackers.

*Id.*  The captain proceeded to contact his carrier's dispatch and suggested that upon the plane's arrival in Columbus, the plaintiffs should be "met by security to determine their intent and examine their luggage."  *Id.*  After the plane stopped, airport security boarded the plane and arrested the plaintiffs. *Id.*

*Cerqueira* also provides an apt illustration of a court applying § 44902(b) to conclude that a reasonable jury could not find that American Airlines acted arbitrarily and caprcisiouly where the flight staff suspected two men of suspicious activity, removed them from the flight, and deplaned the aircraft.  *See* 520 F.3d at 1.   There, the captain had testified at trial that his brief exchange with a man with a ponytail (not Cerqueira) at the departure gate was "probably one of the most odd exchanges that I've ever had with anyone in my entire career, and it concerned me greatly."  *Id.* at 5.   And

according to one of the flight attendants who interacted with Cerqueira prior to boarding, he "was very hostile and extremely insistent that his seat be switched to an exit row seat." *Id.*  She testified that "[t]he entire time that she worked at the gate he was just sitting there staring at her, making her extremely uncomfortable." *Id.*

After boarding, the pilot asked a flight attendant to check on the man with the ponytail, and she noted that he was sitting in an exit row with two other passengers, one of whom was Cerqueira. *Id.*  "She also told the Captain that this passenger [Cerqueira] boarded the plane into his coach class seat when only the first class passengers were called to board, and that the plaintiff immediately went to the bathroom for an extended period of time." *Id.* at 6.  Another flight attendant had also approached the pilot and reported that two of the three passengers in the man with the ponytail's row were "acting very bizarrely" by "asking questions such as 'is this how you want me to do it?'" *Id.*  During boarding, the man with the ponytail had "looked into the cockpit and asked the Captain, 'are you our Captain?' and both the Captain and the first flight attendant "thought this strange." *Id.*  Then, the captain decided "not to depart the gate, but to investigate further." *Id.* at 7.  To do so, "[a]t the captain's request, the three men [including Cerqueira] were removed from the aircraft for further questioning[.]" *Id.*  The captain testified that he based his decision to remove them "on his odd experience with the man in the ponytail, the information and concerns about all three passengers in the exit row expressed by all three flight attendants, as well as the fact that the flight attendants were uncomfortable with the flight departing.  [He] was particularly concerned with the report of [the flight attendant] that both [Cerqueira] and the man with the ponytail 'seemed extremely interested in the duties' of two of the flight attendants.'" *Id.* at 7.  After discovering a box cutter in one of the three passengers' luggage, the captain made

> an extremely difficult decision to empty the aircraft of passengers and baggage.  He
> knew it meant inconvenience to over 100 people, that it would cost AA a great deal of

40

money, and that he and his flight crew would be late getting back to their families. Indeed, he met some resistance from AA employees to unloading the bags, because it is 'quite a project.' The Captain told them, 'that's just what we're going to have to do. We have to make sure this aircraft is safe to depart.'

*Id.* (brackets omitted).  "The Captain flatly denied that the plaintiff's ethnic appearance had anything to do with his decision to remove plaintiff from the flight[.]"  *Id.* at 9.

On these facts, the First Circuit vacated the district court's judgment in favor of Cerqueira on his § 1981 claim, and instructed the district court to enter judgment in favor of American Airlines. *Id.* at 20.  The court articulated several legal principles that justified this outcome. Under the Federal Aviation Act, "the highest priority is assigned to safety, even though the federal aviation statute also has a general prohibition on race and national origin discrimination."  *Id.* at 12; *accord* 49 U.S.C. § 40101(a)(1) (requiring the Secretary of Transportation to consider "assigning and maintaining safety as the highest priority in air commerce" when promulgating regulations). By enacting § 44902(b), the court reasoned, "Congress supplemented the discretion airlines already had under common law to exclude certain passengers, in light of their duty of utmost care to all passengers."  *Id.* (citing *Williams v. Trans World Airlines*, 509 F.2d 942, 946 n.8 (2d Cir. 1975)).

The court adopted the Second Circuit's reasoning in *Williams* that § 44902(b) reconciles the "primary priority of safety with other important policies, such as § 1981's prohibition on racial discrimination."  *Id.* at 14.  "The standard most frequently articulated is that developed by the Second Circuit in *Williams*: that the air carrier's decision to refuse air transport must be shown to be arbitrary or capricious."  *Id.*  (citation omitted). The court then articulated four (4) principles that guide this Court's analysis:

(1) [I]t is the decision by the pilot in charge who refuses passage which stands as the decision of the air carrier. The congressional intent in providing permission for air carriers to refuse transport because of safety concerns would be undercut if the focus were on the air carrier writ large, and not on the individuals given the authority for the decision.

41

(2) Review of a decision to refuse transport by the Captain is restricted to what information was actually known by the decisionmaker at the time of the decision. The test is not what the Captain reasonably should have known. ***

(3) Because the decision must be made in an expedient manner, and it is the Captain who bears the ultimate responsibility of ensuring the safety of the aircraft, there is no obligation on the part of the Captain . . . to make a thorough inquiry into the information received, the sources of that information, or to engage in an investigation. . . . Thus, even mistaken decisions are protected as long as they are not arbitrary or capricious. We will assume that there is an exception to this where no responsible decisionmaker could credit the information provided. ***

(4) The biases of a non-decisionmaker may not be attributed to the decisionmakers.

*Id.* at 14-15 (internal citations omitted).  *Al-Qudhai'een* and *Cerqueira* therefore demonstrate the breadth of Captain Pino's discretion to remove passengers without subjecting AAI and the AAI Employees to liability under § 1981.

Here, just as Al-Qudhai'een made the seemingly innocuous request to the flight attendant to allow his co-passenger come sit with him, Dr. Goldman requested that he be allowed to place his carry-on bag in the first class overhead cabin.  Both Al-Qudhai'een and Dr. Goldman then flouted the order denying their request:  Al-Qudhai'een asked Al-Shalawi to sit with him before the flight attendant gave him permission to do so, and Dr. Goldman placed his briefcase in the first class overhead cabin despite the Flight Staff's warning against placing luggage in that area.[15]  In *Al-Qudhai'een*, the court found that arresting the plaintiffs was not sufficiently arbitrary and capricious even though all the plaintiffs had done was ask similar questions to different flight attendants, the flight attendants had escalated their concern based on the passengers' alleged disobedience, and even though the flight attendant had referenced the plaintiffs' race when they "mentioned to [the captain] that plaintiffs were Arab[.]"  267 F. Supp. 2d at 844.  In this case, the same is true.  The Flight Staff

---

[15] Dr. Goldman seems to believe it matters that the Flight Staff ordered him not to place his carry-on bag in the overhead bin compartment, while he only placed his briefcase there.  It does not.  What matters is that he insisted on placing *some* bag in a particular location of the plane.

reported (allegedly false) concerns of disobedience (e.g., "refusing to go to his seat") and allegedly indirectly referenced Dr. Goldman's Jewish racial identity when they mentioned that he was reporting anti-Semitic treatment. (Doc. No. 1 at PageID#s 13-14, ¶¶ 48-49.)

It does not matter that the Flight Staff's accusations against Dr. Goldman to Captain Pino were allegedly false. Although the Flight Staff "fabricated accusations" that he was "making statements about anti-Semitism[,]" merely mentioning that Dr. Goldman was complaining about his supposed mistreatment does not suggest that Captain Pino's decision to remove Dr. Goldman was arbitrary or capricious. (Doc. No. 36 at PageID# 411.) Their "fabrications" could have been "false" or "racially motivated" but, as explained in *Cerqueira*: "[T]here is no obligation on the part of the Captain . . . to make a thorough inquiry into the information received, the sources of that information, or to engage in an investigation. The Captain . . . is entitled to accept at face value the representations made to him by other air carrier employees." 520 F. 3d at 15 (citations removed). Thus, even if the Flight Staff's accusations against Dr. Goldman were not, as he claims, "based on any legitimate safety concerns[,]" that is of no moment. What matters is that those allegedly false allegations described a obstinate passenger who was "walking up and down the jetway four to five times, blocking other passengers from getting on the plane, refusing to go to his seat, telling people around him that this was Anti-Semitic and a terrorist type of activity that the gate agents and flight attendants were doing to him." (*Id.* at PageID#s 13-14, ¶¶ 48-49.) Captain Pino was entitled to rely on those representations—even if false and even if racially motivated—in deciding whether to order Dr. Goldman's removal because he had no obligation "to make a thorough inquiry into the information received" or "to engage in an investigation." *Cerqueira*, 520 F.3d at 15. He could accept those allegations "at face value[.]" *Id.*

43

The Court finds that it is not plausible that Captain Pino acted arbitrarily and capriciously by ordering the removal of Dr. Goldman after the Flight Staff described him acting erratically, complaining of discrimination, and telling other passengers that he was being treated like a terrorist. Accordingly, the extraordinary nature of those allegations, far from establishing that Dr. Goldman has a claim against AAI and the AAI Employees, instead demonstrates precisely the opposite: Captain Pino did not act arbitrarily or capriciously in relying on them to order Dr. Goldman's removal.

### 4.    Prohibition of Discrimination under 49 U.S.C. § 40127

In his Oppositions to AAI's Motion and the AAI Employees' Motion, Dr. Goldman directs the Court to 49 U.S.C § 40127, which provides that "[a]n air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry."  (Doc. No. 35 at PageID# 389; Doc. No. 36 at PageID# 409.)[16]  In their Replies, AAI and the AAI Employees maintain that his Oppositions "improperly attempt[] to replead his discrimination claim under 49 U.S.C. § 40127" but because his complaint does not reference § 40127, that "argument warrants no consideration."  (Doc. No. 42 at PageID# 475.)

The Court agrees that Dr. Goldman's passing reference to § 40127 in his Opposition brief is an impermissible attempt to replead his discrimination claim under that statute.  It is also unclear that a claim pursuant to § 40127 is viable in light of the fact that "the majority of federal courts to have considered the issue" have found "that the statute does not confer a private right of action."  *Shebley v. United Cont'l Holdings, Inc.*, 357 F. Supp. 3d 684, 690-911 (N.D. Ill. 2019) (collecting cases). However, since in his Complaint Dr. Goldman did not assert a claim under that statute, the Court need not resolve that issue.

---

[16] Dr. Goldman only mentions this statute in response to AAI's and the AAI Employee's Motions.

### 5.    Leave to Amend

Finally, Dr. Goldman requests that "in the event that the Court elects to dismiss the claim, Dr. Goldman respectfully requests that the Court grant him leave to amend his Complaint[.]" (Doc. No. 34 at PageID# 368; Doc. No. 35 at PageID# 389; Doc. No. 36 at PageID# 411.)

This Court does not issue "advisory opinions."  *See Detrick v. KCS Int'l, Inc.*, 2025 WL 1697482 at *8 (N.D. Ohio June 17, 2025) (Barker, J.) (quoting *Begala v. PNC Bank, Ohio Nat. Ass'n*, 214 F.3d 784 (6th Cir. 2000)).  In *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010), the Sixth Circuit affirmed the district court's dismissal of the plaintiffs' claims with prejudice and without leave to amend where

> plaintiffs failed to follow the proper procedure for requesting leave to amend.  They did not actually file a motion to amend; instead, they included the following request in their brief opposing the defendants' motions to dismiss: "Should the Court grant any portion of Ernst & Young's motion to dismiss, Plaintiffs respectfully request an opportunity to move to amend the pleadings and demonstrate that an amendment would cure any deficiencies."  In light of plaintiffs' procedural shortcomings and in the context of the PSLRA, we hold that the district court did not abuse its discretion by denying plaintiffs an opportunity to amend their complaint, and we affirm the district court's judgment.

*Id.* at 486.  The same rule applies here because Dr. Goldman has made identical requests in his Oppositions.  Defendants filed their Motions between May 27, 2025 and June 6, 2025.  (Doc. Nos. 23, 26, 27, 29.)  Upon the filing of each Motion, Dr. Goldman had the right to to file an amended complaint without seeking leave of the Court within twenty-one (21) days.  *See* Fed. R. Civ. P. 15(a)(1)(B).  And thereafter, Dr. Goldman could have sought the Court's leave at any time by filing a motion seeking leave.  *See* Fed. R. Civ. P. 15(a)(2).  He chose neither option, but instead, rested on his Complaint and thereby sought the Court's judgment.  Thus, the Court declines to entertain Dr. Goldman's requests for leave to amend.

Accordingly, for the reasons set forth above, Dr. Goldman's § 1981 claim (Count 1) against all Defendants is dismissed.

**B.    Civil Rights Act Violation under Civil Rights Act of 1964, 42 U.S.C. § 2000d**

Section 2000d provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C § 2000d. "'To state a claim for violation of § 2000d, a plaintiff must allege 1) intentional discrimination on the basis of race or national origin 2) by a program receiving federal funds.'" *Martin v. Kentucky Educ. Television*, 2024 WL 4127278 at *2 (E.D. Ky. Sept. 6, 2024) (quoting *Abdullah v. Small Bus. Banking Dep't of Bank of Am.*, 532 Fed. Appx. 89, 90 (3d Cir. 2013)); *see also Loper v. Cuyahoga Cnty. Child. & Fam. Servs.*, 2019 WL 1597552 at *3 (N.D. Ohio Apr. 15, 2019) (citing *Buchanan v. City of Bolivar,* 99 F.3d 1352, 1356-57 (6th Cir. 1996)) ("In order to state a claim for relief under Title VI, Plaintiff must allege facts indicating that she was intentionally discriminated against on the basis of her race, color, or national origin, and that the 'program' or 'activity' receives federal funding.").

All Defendants argue that the Court should dismiss Dr. Goldman's § 2000d claim for two independent reasons. First, his § 2000d claim also requires discrimination on the basis of race and therefore fails for the same reason his § 1981 claim fails. Second, he has failed to sufficiently allege that the Defendants received federal funding.

In addition, the Republic Defendants and AAI argue that companies cannot be liable for a § 2000d claim based on a theory of vicarious liability, and the AAI Employees argue that they cannot be held liable as individuals. The Court addresses each argument in turn.

**1.    Dr. Goldman's well-pled allegations fail to plausibly show that Defendants intentionally discriminated against him based on his Jewish racial identity.**

As noted above, all Defendants have argued that Dr Goldman's § 2000d claim fails because he did not plausibly allege discrimination based on race, thereby incorporating their arguments

46

against his § 1981 claim.  (Doc. No. 23 at PageID# 226; Doc. No. 26 at PageID# 258.)  Dr. Goldman does not respond to that contention.  Courts dismiss both claims when a plaintiff's allegations do not plausibly allege intentional racial discrimination, so the Court sees no reason to depart from that practice here.  *See, e.g.*, *Cerqueira*, 520 F.3d at 13 n.14 ("AA argues that no Title VI claim is stated here because the only federal financial assistance AA receives is government compensation under the Stabilization Act, which does not qualify as federal financial assistance under 42 U.S.C. § 2000d. We need not reach the issue. Any Title VI claim would fail for the same reasons we express."); *Terzneh v. Fed. Nat'l Mortg. Ass'n*, 2021 WL 4529707 at *5 (W.D. Tenn. Oct. 4, 2021) (holding the "proposed amendment therefore fails to state a claim of race discrimination against either Defendant under § 1981, § 1982, § 2000d, or equal protection" because the plaintiff failed to allege facts indicating "discriminatory animus[.]").

Therefore, for the reasons articulated in Section IV.A.1.,  Dr. Goldman has failed to sufficiently plead intentional racial discrimination in violation of § 2000d.

### 2.    Dr. Goldman failed to plead a sufficient nexus between the alleged discrimination and receipt of federal funds.

To state a claim under Title VI, a plaintiff  must allege that he was "denied the benefits of, or [was] subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The Republic Defendants argue that Dr. Goldman's allegations fail to meet Rule 8 pleading standards with respect to this element because "he has not identified a federal program" and "does not allege how such funding is related to the incident at issue."  (Doc. No. 23 at PageID# 227.)  AAI and the AAI Employees largely echo this argument in their Motions.  (Doc. No. 26 at PageID#s 257-59.) They cite several cases where district courts dismissed Title VI claims for failure to plead sufficient allegations about federal funding.  (*Id.*)

In his Oppositions, Dr. Goldman attempts to rebut their argument by pointing out that one of the cases the Republic Defendants, AAI, and the AAI Employees cite, *Steptoe v. Sav. of Am.*, 800 F. Supp. 1542 (N.D. Ohio 1992), was decided at summary judgment, not on a motion to dismiss. (Doc. No. 34 at PageID# 370; Doc. No. 35 at PageID# 389.) In their Replies, Defendants largely reiterate their position that there must be a "nexus" between the funding and the discrimination at issue. (Doc. No. 42 at PageID# 477; Doc. No. 45 at PageID#s 507-08.)

The Court agrees with Defendants that Dr. Goldman has failed to include sufficient factual allegations to satisfy the second element of his § 2000d claim.

The Republic Defendants, AAI, and the AAI Employees cite to *Darden v. Montgomery Cnty. Bd. of Comm'rs*, 2024 U.S. App. LEXIS 20771 at *12-13 (6th Cir. Aug. 14, 2024), which Dr. Goldman does not address. In *Darden*, the Court affirmed the district court's dismissal of the plaintiff's § 2000d claim, reasoning as follows:

> We agree with the district court that Darden failed to make out a Title VI claim because his complaint never alleged that any defendant received federal funding. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Darden now argues that the district court should have known that Montgomery County Children Services receives federal funding. It is, however, a plaintiff's burden to plead facts to support each aspect of his Title VI claim. *See id.* Darden never mentioned such funding below, and even now cites no authority showing that any defendant receives federal funding.

2024 U.S. App. LEXIS 20771 at *13-14. *Darden*, however, is distinguishable from this case because here, Dr. Goldman "mentions" receipt of federal funds by Defendants:

> At all times relevant hereto, American, American Airlines Group, Republic, and/or Republic Airways Holdings were and/or are commercial air carriers receiving federal assistance as they operate according to the rules and regulations of the Federal Aviation Agency and the Department of Transporation, Department of Homeland Security, and work in compliance with various other federal agencies. American Airlines and Republic Airways also receive federal funds via federal subsidies and therefore are subject to 42 U.S.C. § 2000d. Defendants through and by the actions of their agents and employees violated 42 U.S.C. § 2000d when they deprived, directly or indirectly, individually or collectively, the Plaintiff of the participation and benefits of federally regulated commercial air travel.

48

(Doc. No. 1 at PageID#s 21-22, ¶ 93.)  Thus, according to Dr. Goldman, he properly pled federal funding under § 2000d because Paragraph 93 alleges that the Corporate Defendants[17] (1) operated according to regulations of FAA, DOT, and DHS and they "work in compliance with various other federal agencies," and (2) they "receive federal funds via federal subsidies."  (*Id.*)

The problem for Dr. Goldman is that he did not plead facts that establish the requisite "nexus" "between the funding and the discrimination to show that he was denied the benefits of the funding because of discrimination."  *Hutchins v. Frontier Airlines, Inc.*, 2023 WL 11878194 at *4 (S.D. Fla. Apr. 18, 2023) (citing *Brannon v. Delta Airlines, Inc.*, 434 F. Supp. 3d 124, 138 (S.D.N.Y 2020)); *Shebley v. United Cont'l Holdings, Inc.*, 2020 WL 2836796 at *5 (N.D. Ill. May 31, 2020) ("Without identifying a nexus between federal financial assistance and a program or activity conducted by Defendants, the Shebleys cannot state a claim under Title VI.");  *James v. Am. Airlines, Inc.*, 247 F. Supp. 3d 297, 306 (E.D.N.Y. 2017) (internal citation omitted) ("Here, James does not identify any 'program or activity receiving Federal financial assistance' to sustain her claim under Title VI.  A claim under Title VI cannot proceed without that requisite nexus.").  That is why "[t]he plaintiff 'must identify the specific program or activity that receives federal funds."  *Shebley*, 2020 WL 2836796 at *5 (citation omitted).  Defendants cite to all of these cases, and Dr. Goldman does not respond to Defendants' reliance upon them.

Although Dr. Goldman is correct that the court in *Steptoe* was analyzing a motion for summary judgment, not a motion to dismiss, that does not matter here.  Therein, the court explicitly rejected Dr. Goldman's theory that a plaintiff can base his allegation of federal funding merely on Defendants operating in compliance with federal regulations and agencies:  "The mere fact that [the

---

[17] Defendants AAI, AAG, Republic Airways, Inc., and Republic Airways Holdings Inc. are hereinafter referred to collectively as the "Corporate Defendants" and Defendants Ford, Powell, Symes-Patalano, Pino, and Powell are collectively referred to as the "Individual Defendants."

defendant] is bound by certain federal statutes or participates in certain federal programs is insufficient to give plaintiffs standing to bring a claim under 42 U.S.C. § 2000d." *Steptoe*, 800 F. Supp. at 1548.

That leaves Dr. Goldman only with his bare allegation that "American Airlines and Republic Airways also receive federal funds via federal subsidies and therefore are subject to 42 U.S.C. § 2000d." (Doc. No. 1 at PageID# 370, ¶ 93.)   In essence, he alleges that American Airlines and Republic Airways receive "federal subsidies" but he does not identify which subsidies they receive, or how any Defendant used those subsidies in the "program or activity" (here, Flight 4302) to allegedly discriminate against him.  Dr. Goldman was required to "identify the specific program or activity that receives federal funds[,]" *Shebley*, 2020 WL 2836796 at *5, but he identified only the names of the Defendants and conclusorily added that they received federal subsidies.  That is not enough.

Accordingly, Dr. Goldman has failed to sufficiently plead a nexus between the alleged discrimination and a specific program or activity receiving federal funds,  and therefore failed to state a claim under § 2000d.

### 3.    42 U.S.C. § 2000d claims do not apply to the Individual Defendants.

In their Motion, the Republic Defendants argue that Dr. Goldman cannot maintain § 2000d claims against the individual employees, Symes-Patalano and Captain Pino. (Doc. No. 23 at PageID# 228.)  The AAI Employees advance the same argument in their Motion. (Doc. No. 27 at PageID# 285-87.)  In his Oppositions, Dr. Goldman concedes this point.  (Doc. No. 34 at PageID# 371 ["[A]lthough the [individual Defendants] assert that § 2000d claims cannot be asserted against individuals . . . Dr. Goldman nevertheless maintains that his Complaint alleges a plausible claim for relief under § 2000d against [the Corporate Defendants]"]; Doc. No. 36 at PageID# 413 [same].)

50

The Individual Defendants are correct that they cannot be sued under Title VI because they are not entities receiving federal funds. *See, e.g.*, *Smith v. Spalding Univ.*, 2016 WL 3748522 at *2 (W.D. Ky. July 8, 2016) (citing *Buchan*, 99 F.3d at 1356) ("The Sixth Circuit has held that individual defendants cannot be sued under Title VI."); *see also Huang v. Presbyterian Church (U.S.A.)*, 346 F. Supp. 3d 961, 980 n. 21 (E.D. Ky. 2018); *Terzneh v. Fed. Nat'l Mortg. Ass'n*, 2021 WL 4529707 at *5 (W.D. Tenn. Oct. 4, 2021) (quoting 42 U.S.C. § 2000d) ("The Court notes that Plaintiff cannot maintain a claim against Defendant Tigert under § 2000d because Title VI applies only to a "program or activity receiving Federal financial assistance.' And so a plaintiff cannot state a Title VI claim against an individual defendant.").

Accordingly, Dr. Goldman's § 2000d claims against the Individual Defendants are additionally subject to dismissal because they are not entities that receive federal financial assistance.

### 4. Dr. Goldman failed to plead fact-based allegations that the Corporate Defendants participated in, were aware of, or were deliberately indifferent to any discriminatory acts.

In their Motion, the Republic Defendants also argue that Dr. Goldman's § 2000d claim fails because Title VI does not support vicarious liability based on the actions of individual employees. According to the Republic Defendants, Dr. Goldman was required to allege that they participated in, were aware of, or were deliberately indifferent to the discrimination Dr. Goldman alleges. (Doc. No. 23 at PageID#s 227-28.) AAI asserts the same argument in its Motion, arguing that "an entity is not liable for discrimination under Section 2000d because its employee engaged in discriminatory conduct." (Doc. No. 26 at PageID# 259.)

In his Opposition to the Republic Defendants' Motion, Dr. Goldman claims that his Complaint properly alleges direct "institiutional involvement or deliberate indifference" because he alleges that "they failed to investigate the incident prior to ordering him to be forcibly removed" and failed to take precautions to prevent racial profiling. (Doc. No. 34 at PageID# 371) (quoting Doc. No. 1 at

51

PageID#s 25-26, ¶¶ 107, 110-11). And in his Opposition to AAI's Motion, he points to Paragraph 7 as evidence of a "broader discriminatory practice or policy[,]" where he enumerates several other district court cases involving alleged discrimination by Jewish plaintiffs against American Airlines and cites a news article.  (Doc. No. 35 at PageID# 390) (citing Doc. No. 1 at PageID# 4 , ¶ 7.)

In its Reply, the Republic Defendants repeat their arguments.  (Doc. No. 45 at PageID# 507.) AAI, however, responds to Dr. Goldman's reference to Paragraph 7 in its Reply, explaining that those other incidents do not relate to Flight 4302, and that his own allegations in Paragraph 93 attempt to trace liability only to Defendants "through and by the actions of their agents and employees[.]"  (Doc. No. 42 at PageID# 478.)

In *Foster v. Michigan*, 573 Fed. Appx. 337 (6th Cir. 2014), the Sixth Circuit held that vicarious liability was not available under Title VI, and that instead, a Title VI claim requires "fact-based allegations that [the defendant] participated in, was aware of, or was deliberately indifferent to any discriminatory acts."  *Id.* at 389.   "Actual notice of the alleged discrimination is an essential element of a deliberate indifference claim."  *Shah v. Univ. of Toledo*, 2021 WL 5140969 at *4 (N.D. Ohio Nov. 4, 2021) (Knepp, J.), *appeal dismissed*, 2022 WL 17493374 (6th Cir. July 18, 2022) (quoting *Doe v. Ohio State Univ.*, 323 F. Supp. 3d 962, 968 (S.D. Ohio 2018)).  Therefore "to state a claim under Title VI, a plaintiff must allege something more than simply the actions of individuals." *Id.* (citations omitted).

In *Shah*, the court applied *Foster* to dismiss the plaintiff's § 2000d claim.  *Id.* at *5.  The court reasoned that the plaintiff's "discrimination allegations are entirely based on the actions of the individual Defendants and Plaintiff fails to plead facts imputing knowledge of or deliberate indifference to those actions to UT."  *Id.*  What was missing, the court reasoned, were "factual

assertions that someone outside of the individual Defendants in this case had actual notice of and was deliberately indifferent to any racially discriminatory conduct." *Id.*

Dr. Goldman has likewise not sufficiently set forth "fact-based allegations that [any Defendant] participated in, was aware of, or was deliberately indifferent to any discriminatory acts." *Foster*, 573 Fed. Appx. at 389.  None of the allegations he points to suggest institutional indifference to or awareness of racial discrimination against Jewish people.  Paragraph 107 alleges that the Defendants "failed to properly investigate the incident prior to ordering Plaintiff to be forcibly removed from the aircraft under the threat of arrest," but that is not an individual instance which represents an institutional failure—it is simply an allegation that the individual employees in *this case* did not properly investigate whether he posed a safety threat.  (*Id.* at PageID# 25, ¶ 107.)  Paragraph 110 likewise only references that the Defendants "failed to take such precautions [e.g., to prevent racial profiling] *on January 18, 2024, as evidenced by what Dr. Goldman experienced.*"  (*Id.* at PageID# 26, ¶ 110)  Dr. Goldman's theory of liability inverts the required showing under *Foster* because he asks the Court to infer the "fail[ure] to take such precautions" *from* the individual incident Dr. Goldman complains of, but does not point to any other incidents.  (*Id.*)  Paragraph 111 also does not describe any institutional indifference to or awareness of racial discrimination, but only vaguely alleges that "the above described conditions which [Defendants] either created or failed to remedy or mitigate" caused Dr. Goldman damages, but it does not explain any "condition" that any Defendant allegedly created.  (*Id.*, ¶ 111.)[18]

---

[18] There are two additional points worth noting about Dr. Goldman's argument on this issue.  First, although he points to Paragraphs 107, 110, and 111 to support his § 2000d claim, none of those allegations are included in the sub-section of his Complaint detailing the basis for liability under § 2000d, but rather, are only made later under his negligence claim. (Doc. No. 1 at PageID#s 21-22, 25-26.)  Second, while Dr. Goldman's Oppositions do not discuss Paragraph 108, that allegation arguably comes closest to alleging institutional involvement, but it too falls short.  It alleges that "the policies and practices of [the Corporate Defendants] . . . caused Plaintiff to experience unlawful denial of services and/or transportation; markedly hostile conduct; racial discrimination and profiling . . ."  (*Id.* at PageID# 25, ¶ 108.)  Paragraph 108 does not identify a single "policy" or "practice" so it also does not plausibly allege any institution-level discrimination.

Next, AAI is correct that Dr. Goldman's allegations in Paragraph 7 do not show institutional discrimination or awareness.  He alleges that:

> Unfortunately, American Airlines, Inc. and/or American Airline Group Inc.'s discriminatory treatment of Plaintiff was not an isolated instance. In fact, as alleged below, American Airlines, Inc. has a documented history of frequently subjecting Jewish and/or minority passengers to differential treatment and bigotry, as can be seen from the following non-exhaustive list of instances: *Birman v. American Airlines Inc.*, 1:21-cv-06634, (E.D.N.Y); *Adler v. American Airlines, Inc.*, 4:20-cv-00317, (S.D. Tex.); *Jackson v. American Airlines, Inc.*, 1:24-cv-03818 (E.D. N.Y.); https://onemileatatime.com/news/american-airlines-anti-semitism/  Ben Schlappig, American Accused of Shocking Anti-Semitism, ONE MILE AT A TIME (May 7, 2024).

(*Id.* at PageID# 4, ¶ 7)[19]  While Dr. Goldman may believe that there is a "documented history" of AAI's discrimination, none of those three cases help prove that because the courts in those three cases made no factual findings against AAI.  Instead, the court dismissed the plaintiffs' claims in each of those cases pursuant to a stipulation of dismissal.  *See Birman*, 1:21-cv-6634, Doc. No 18 (E.D.N.Y. Jan. 13, 2023); *Adler*, 4:20-cv-317, Doc. No. 10 (S.D. Tex. Apr. 10, 2020); *Jackson*, 1:21-cv-6634, Doc. No. 20 (E.D.N.Y. Dec. 19, 2024).  Finally, the Court rejects that Ben Schlappig's article amounts to an allegation of institution-level discrimination.  Indeed, the very title of the article belies that conclusion: it only notes that AAI was *accused* of discrimination, but not that Schlappig had any first-hand knowledge of any such discrimination.

Accordingly, the Court concludes that Dr. Goldman's § 2000d claim should be dismissed for the additional reason that he has failed to plead fact-based allegations that the Corporate Defendants participated in, were aware of, or were deliberately indifferent to any discriminatory acts.  *Foster*, 573 Fed. Appx. at 389.

---

[19] Paragraph 109 refers to the "multiple prior incidents of racial and religious discrimination on American and/or American Airlines Group's flights," but it does not specify any such incident.  The Court construes Paragraph 109 as referring to the "incidents" in *Birman*, *Adler*, and *Jackson* that Dr. Goldman identifies in  Paragraph 7.  (*Id.* at PageID# 26, ¶ 109.)

### C.      American Airlines Group

As noted above, AAG's Motion incorporates all arguments asserted by AAI in AAI's Motion. (Doc. No. 29 at PageID# 324-325.)  Dr. Goldman  takes issue with AAG's intent to incorporate AAI's Motion, claiming that "AAG's reference to a wholly separate motion involving a separate Defendant is insufficient for it to now seek relief in the form of dismissal, here" but requests that his own arguments against AAI's Motion be incorporated as well.  (Doc. No. 41 at PageID# 452.)  In its Reply, AAG responds that Dr. Goldman has presented "no case law in support of his argument that reference to a separate motion is insufficient to seek relief on a Motion to dismiss."  (Doc. No. 44 at PageID# 496.)

First, the Court agrees with AAG that there is no rule prohibiting it from moving for dismissal by incorporating its co-Defendant's argument by reference.  In fact, incorporation by reference helpfully avoids duplicative briefing, which promotes judicial economy.  Second, Dr. Goldman points to no AAI-specific allegation or basis for dismissal that does not apply with equal force to AAG.

Accordingly, because the Court is dismissing Counts 1 and 2 against AAI, the Court additionally dismisses Counts 1 and 2 against AAG, and declines to address the remainder of AAG's arguments for dismissal.

### D.      The Court declines to exercise supplemental jurisdiction over Dr. Goldman's state-law claims.

Having dismissed Dr. Goldman's only federal claims (Counts 1 and 2), the Court declines to exercise supplemental jurisdiction over the remaining state-law claims (Counts 3, 4, 5, and 6).

Dr. Goldman asserts jurisdiction over his action on the following basis: "This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. § 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant

to 28 U.S.C. § 1367(a)." (Doc. No. 1 at PageID# 4, ¶ 9.) Because the Court has dismissed his federal claims, jurisdiction over Dr. Goldman's state-law claims must derive from diversity jurisdiction under 28 U.S.C. § 1332 or supplemental jurisdiction under 28 U.S.C. § 1367.

Diversity jurisdiction requires complete diversity of citizenship and at least a $75,000 amount in controversy. 28 U.S.C. § 1332. "'The party asserting diversity jurisdiction bears the burden of establishing the parties' citizenships' and that 'means that a plaintiff' 'must fully allege the citizenship of each party.'" *Hamilton v. Durham Sch. Servs., LP*, 2024 WL 584467 at *3 (E.D. Mich. Feb. 13, 2024) (quoting *Akno 101 Market Street St. Louis Missour LLC v. Pourtaghi*, 43 F.4th 624, 627 (6th Cir. 2022)); *Clay v. Gateway Fin. Sols.*, 2025 WL 3124163 at *5 (S.D. Ohio Nov. 7, 2025), *report and recommendation adopted*, 2025 WL 3502519 (S.D. Ohio Dec. 5, 2025) (citing *Conner v. Greef*, 99 Fed. Appx. 577, 580 (6th Cir. 2004)) ("A plaintiff satisfies this burden only if the complaint establishes complete diversity **on its face**."). Additionally, "[t]he party seeking the federal forum bears the burden of proving that the amount in controversy exceeds $75,000." *Schmidt Ind., Inc., v. The Huntington Nat'l Bank*, , 2022 WL 2121527 at *2 (E.D. Mich. June 13, 2022) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Union Home Mortg. Corp. v. Ballew*, 2025 WL 2418912, at *3 (N.D. Ohio Aug. 21, 2025) (Calabrese, J.) ("To carry its burden of establishing the amount in controversy, Plaintiff supplied the declaration of Alex Cribari . . ."); *Young v. Grossley*, 2025 WL 1559601 at *3 (M.D. Tenn. June 2, 2025) ("[T]he Amended Complaint does not satisfy Plaintiff's burden of pleading that the amount in controversy exceeds $75,000."); *Cornell v. Fox News Network*, 2020 WL 4530598 at *3 (S.D. Ohio Aug. 6, 2020) ("Plaintiff's complaint seeks 'an unspecified amount of damages,' which is insufficient to meet the amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a).").

Dr. Goldman has not satisfied his burden to plead diversity jurisdiction because (1) he does not allege the state of citizenship of Defendants Ford, Symes-Patalano, Captain Pino, or Powell, and (2) he does not make any allegation regarding the amount of damages he seeks.  (Doc. No. 1 at PageID#s 9-10, ¶¶ 28-32; *Id.* at PageID# 32, Prayer For Relief.)  Thus, the Court does not have diversity jurisdiction over Dr. Goldman's state-law claims.

Therefore, the only remaining basis for Dr. Goldman's state-law claims is supplemental jurisdiction under § 1367.  Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction.  "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'"  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[A] district court has broad discretion to decide whether to exercise jurisdiction over state law claims."  *Smith v. Erie Cty. Sheriff's Dep't*,  603 Fed. Appx. 414, 424 (6th Cir. 2015).  However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *accord Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

Here, the Court exercises its "broad discretion" to conclude that it will not exercise supplemental jurisdiction over Dr. Goldman's remaining state-law claims.  *Smith*, 603 Fed. Appx. at 424.  As other courts have recognized, "[t]he interest in avoiding needless decisions on state-law issues as a matter of comity weighs heavily against supplemental jurisdiction."  *Howell v. Buckeye*

*Ranch, Inc.*, 2013 WL 1282518 at *8 (S.D. Ohio Mar. 27, 2013); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law"); *White v. City of Cleveland, et al.*, 2020 WL 7640932 at *24 (N.D. Ohio Dec. 23, 2020); *Barrio Bros., LLC v. Revolucion, LLC*, 2021 WL 2895509 at *18 (N.D. Ohio July 9, 2021). Were the Court to retain jurisdiction here, it would be required to delve into purely state-law claims. Such purely state-law decisions are better reserved for a state court.

Accordingly, the Court declines to exercise supplemental jurisdiction over Dr. Goldman's state-law claims.

### E.    Punitive Damages

Because the Court has dismissed all claims, Dr. Goldman is not entitled to punitive damages because punitive damages are a remedy, not a freestanding cause of action.  *See, e.g.*, *White v. Allstate Ins. Co.*, 2025 WL 1532464 at *4 (N.D. Ohio May 29, 2025) ("Punitive damages cannot stand independently; they rise and fall with the substantive claims.  If Plaintiff's causes of actions are dismissed, he does not have a claim for punitive damages either."); *PNC Bank, N.A. v. Merenbloom*, 2017 WL 3973962 at *3 (6th Cir. June 16, 2017) (citation omitted) ("[A] claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action.").

## V.    Conclusion

Accordingly, for the reasons above, the Republic Defendants' Motion (Doc. No. 23) is GRANTED; AAI's Motion (Doc. No. 26) is GRANTED; the AAI Employees' Motion (Doc. No. 27) is GRANTED; and AAG's Motion (Doc. No. 29) is GRANTED.  Counts 1 and 2 are hereby DISMISSED WITH PREJUDICE, and Counts 3, 4, 5, and 6 are hereby DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

                                    *s/Pamela A. Barker*
                                    PAMELA A. BARKER
Date:  December 30, 2025        U. S. DISTRICT JUDGE